[Civ. No. 24294. First Dist., Div. Two. Jan. 29, 1969.]

DAVID KRIEGLER, Plaintiff and Respondent, v. EICHLER HOMES, INC. et al., Defendants, Cross-complainants and Appellants; STEVE ANDERSON et al., Cross-defendants and Respondents.

David Freidenrich, Leonard Ware, Eleanor M. Kraft and Kraft & Kraft for Defendants, Cross-complainants and Appellants.

No appearance for Plaintiff and Respondent.

Hoge, Fenton, Jones & Appel, James B. Eggert, Whitney & Lariviere and John P. Whitney for Cross-defendants and Respondents.

TAYLOR, J.—Respondent Kriegler filed this action for physical damage sustained as the result of the failure of a radiant heating system in a home constructed by appellants, Eichler Homes, Inc. and Joseph L. Eichler (hereafter Eichler), who cross-complained against the supplier, respondent, General Motors Corporation (hereafter General Motors) and the heating contractors, respondents, Anderson and Rother, individually and doing business as Arro Company (hereafter collectively referred to as Arro). Eichler appeals from the judgment in favor of Kriegler on the complaint and in favor of General Motors and Arro on the cross-complaint.

The questions presented are: 1) whether Eichler was liable to Kriegler on the theory of strict liability; 2) the sufficiency of the evidence to sustain the judgment in favor of Kriegler on the basis of Eichler's negligence in installing the radiant heating system; and 3) the propriety of the trial court's conclusions that General Motors and Arro were not liable to Eichler for breach of any implied warranties and that, in any event, recovery on the cross-complaint was barred by Eichler's negligence.

The basic facts are not in dispute. In April 1957 Kriegler purchased a home in Palo Alto that had been constructed by Eichler in the last quarter of 1951 and sold to Kriegler's predecessors, the Resings, in January 1952. Eichler employed Arro as the heating contractor. Because of a copper shortage caused by the Korean war, Arro obtained terne coated steel tubing from General Motors. In the fall of 1951, Arro installed this steel tubing in the Kriegler home and guaranteed the radiant heating system in writing. Arro installed steel

tubing radiant heating systems in at least 4,000 homes for Eichler.

The method used to install the steel tubing was the same as that used for copper. After Eichler prepared the building site by providing a four-inch fill covered with a vapor-proof membrane of Sisal-Kraft paper and putting a net of steel mesh over the paper, Arro shaped the tubing, laid it on the mesh and tied it to the mesh. Then, Arro pumped the piping up to the hydrostatic pressure of not less than 250 and generally to 300, put a guage on it and left it for the approval of the city and the Federal Housing Administration inspectors (hereafter F.H.A.). After a hydrostatic pressure check by these inspectors, Eichler or its other subcontractors poured the concrete with the pressure gauge still operating, while the workers lifted the wire mesh and tubing up into the concrete with hooks. The objective of this process was to place the tubing into the center of the concrete slab to insure optimum heat distribution.

At this time, F.H.A. required either a double slab or use of a membrane with a single slab, and had approved both the above method of installation and the use of General Motors steel tubing.

In November 1959, as a result of the corrosion of the steel tubing, the radiant heating system of the Kriegler home failed. The emergency and final repairs required removal and storage of furniture, as well as the temporary acquisition by Kriegler and his family of other shelter. When Arro first attempted to repair the system, it discovered that the tubing was corroded from the outside. Arro first attempted to splice in a new pipe but after the system continued to leak, concluded that the tubing was probably corroded throughout and replaced the entire heating system with a new one.

The trial court found on the complaint, so far as pertinent, that: as a result of Eichler's negligence, Kriegler's home suffered a diminution in value of $5,073.18; and that regardless of negligence, Eichler was liable to Kriegler in the above amount on the theory of strict liability because the radiant heating system, as installed, was defective.

 Eichler first contends that the trial court erred in finding Eichler liable to Kriegler regardless of negligence. The question is one of first impression in this state. Although Kriegler has not filed any brief and we are under no duty to look up the law (*Roth* v. *Keene*, 256 Cal.App.2d 725, 727 [64 Cal.Rptr. 399] ; Cal. Rules of Court, rule 17(b) ), Eichler still

has the burden of demonstrating error (*Perfection Paint Products* v. *Johnson,* 164 Cal.App.2d 739 [330 P.2d 829]).

Eichler concedes that the doctrine of strict liability in tort applies to physical harm to property (*Gherna* v. *Ford Motor Co.,* 246 Cal.App.2d 639, 649 [55 Cal.Rptr. 94]) but argues that the doctrine cannot be applied to homes or builders. We do not agree. As set forth in *Greenman* v. *Yuba Power Products, Inc.,* 59 Cal.2d 57 [27 Cal.Rptr. 697, 377 P.2d 897, 13 A.L.R.3d 1049], and *Vandermark* v. *Ford Motor Co.,* 61 Cal. 2d 256 [37 Cal.Rptr. 896, 391 P.2d 168], the strict liability doctrine applies when the plaintiff proves that he was injured while using the instrumentality in a way it was intended to be used as a result of a defect in design and manufacture of which plaintiff was not aware and which made the instrumentality unsafe for its intended use. So far, it has been applied in this state only to manufacturers, retailers and suppliers of personal property and rejected as to sales of real estate (*Conolley* v. *Bull,* 258 Cal.App.2d 183, 195 [65 Cal.Rptr. 689]). We recently pointed out in *Barth* v. *B. F. Goodrich Tire Co.,* 265 Cal.App.2d 228, at pp. 252-253 [71 Cal.Rptr. 306], that the reasoning behind the doctrine applies to any case of injury resulting from the risk-creating conduct of a seller in any stage of the production and distribution of goods.

We think, in terms of today's society, there are no meaningful distinctions between Eichler's mass production and sale of homes and the mass production and sale of automobiles and that the pertinent overriding policy considerations are the same. Law, as an instrument of justice, has infinite capacity for growth to meet changing needs and mores. Nowhere is this better illustrated than in the recent developments in the field of products liability. The law should be based on current concepts of what is right and just and the judiciary should be alert to the never-ending need for keeping legal principles abreast of the times. Ancient distinctions that make no sense in today's society and that tend to discredit the law should be readily rejected as they were step by step in *Greenman* and *Vandermark.*

We find support in our view in the comments of our most eminent authority in the law of torts (see Prosser, *Strict Liability to the Consumer in California,* 18 Hastings L.J., 9, 20, and the exceptionally able and well-thought out opinion of the Supreme Court of New Jersey, in a case almost on all fours with the instant one (*Schipper* v. *Levitt & Sons, Inc.* (1965)

44 N.J. 70 [207 A.2d 314]).[1] In *Schipper*, the purchaser of a mass-produced home sued the builder-vendor for injuries sustained by the child of a lessee. The child was injured by excessively hot water drawn from a faucet in a hot water system that had been installed without a mixing valve, a defect as latent as the incorrect positioning of the pipes in the instant case. In reversing a judgment of nonsuit, the Supreme Court held that the builder-vendor was liable to the purchaser on the basis of strict liability. In language equally applicable here, the court said: "When a vendee buys a development house from an advertised model, as in a Levitt or in a comparable project, he clearly relies on the skill of the developer and on its implied representation that the house will be erected in reasonably workmanlike manner and will be reasonably fit for habitation. He has no architect or other professional adviser of his own, he has no real competency to inspect on his own, his actual examination is, in the nature of things, largely superficial, and his opportunity for obtaining meaningful protective changes in the conveyancing documents prepared by the builder vendor is negligible. If there is improper construction such as a defective heating system or a defective ceiling, stairway and the like, the well-being of the vendee and others is seriously endangered and serious injury is foreseeable. The public interest dictates that if such injury does result from the defective construction, its cost should be borne by the responsible developer who created the danger and who is in the better economic position to bear the loss rather than by the injured party who justifiably relied on the developer's skill and implied representation." (Pp. 325-326.)

"Buyers of mass produced development homes are not on an equal footing with the builder vendors and are no more able to protect themselvs in the deed than are automobile purchasers in a position to protect themselves in the bill of sale." (P. 326.) The court then pointed out that the imposition of strict liability principles on builders and developers would not make them insurers of the safety of all who thereafter came on the premises. In determining whether the house was defective, the test would be one of reasonableness rather than perfection.

As it cannot be disputed that Kriegler here relied on the skill of Eichler in producing a home with a heating system

---

[1]Cited with approval in *Connor* v. *Great Western Sav. & Loan Assn.* (1968) 69 Cal.2d 850 [73 Cal.Rptr. 369, 447 P.2d 609], which, although not directly in point, supports our view.

that was reasonably fit for its intended purpose, the trial court properly concluded that Eichler was liable to Kriegler on the basis of strict liability, and the judgment in favor of Kriegler must be affirmed on that ground alone.

 Since we have concluded above that a sufficient basis appears for sustaining the judgment in favor of Kriegler, we will only briefly discuss Eichler's remaining contention in relation to that judgment. Eichler contends that the evidence does not support the findings concerning its negligence in the installation of the heating system. The detailed findings are set forth in the footnote below.[2]

As Kriegler has not seen fit to file a brief in this case, we assume that: 1) the facts as stated in Eichler's brief are true; 2) the evidence is insufficient to support material findings of the trial court; and 3) Kriegler has abandoned any attempt to support the judgment and the ground urged by Eichler for reversing the judgment is meritorious (*Roth* v. *Keene, supra*).

Applying the above rule, we assume that the evidence is insufficient to support the findings concerning Eichler's negligence in the installation of the heating system. Accordingly, the findings and conclusions declaring Eichler's negligence are hereby stricken, and the judgment in favor of Kriegler otherwise affirmed.

 We turn then to Eichler's appeal from that portion of the judgment denying relief on its cross-complaint against General Motors and Arro. As indicated above, the trial court found as to General Motors that the steel tubing was suitable for such use if properly installed, that there was no breach of the implied warranties of fitness for intended use or merchantability, and that there were no express warranties. As to Arro, the court found there was an express warranty for five years but that no implied warranties were made. The court also found that Arro did not breach its express warranty but

---

[2]The court found that at the time of the installation of the heating system in the Kriegler home, the building and construction industry had knowledge of methods whereby steel tubing could be used as a substitute for copper tubing with reasonable protection against corrosion. An essential element in such methods was the control positioning of the tubing well within the cement slab. Because of the susceptibility to the rust and corrosion in such steel tubing, it was good practice in the building and construction industry, both as to custom homes and tract developments, to take precautions to insure controlled and uniform positioning of the tubing well within the concrete slab. This was usually accomplished by other builders of custom and tract homes through the use of (1) double slab construction, (2) concrete blocks, or (3) wire clips. Eichler was negligent in not using any of these methods then known and used in the industry.

that the damages were caused by Eichler's negligence in positioning the heating system.

Eichler complains only of the findings relating to implied warranty, and the further superfluous finding that in any event, Eichler was barred from any recovery on its cross-complaint because of its negligence. Eichler does not attack the sufficiency of the evidence[3] as to the findings that no implied warranties were breached by General Motors or Arro, but only states that the trial court failed to indicate whether General Motors made any implied warranties of fitness as to the tubing. This contention borders on the frivolous, as implied warranties are created by operation of law.

The uncontroverted evidence established that the steel tubing was sold by General Motors to Arro in May 1951. The applicable provision of law at this time was section 1735 of the Civil Code (set forth below).[4]

This section imposes an absolute liability regardless of negligence (*Vaccarezza* v. *Sanguinetti,* 71 Cal.App.2d 687 [163 P.2d 470]) and in a similar situation has been held to include a prospective warranty that tubing would not, within a reasonable period of time, corrode and leak (*Aced* v. *Hobbs-Sesack Plumbing Co.,* 55 Cal.2d 573, 583-585 [12 Cal.Rptr. 257, 360 P.2d 897]). We must assume that the trial court was familiar with these rules and based its conclusions of non-liability on the evidence presented. Accordingly, the judgment

---

[3]Accordingly, as to the appeal from the judgment on the cross-complaint, the usual assumptions concerning the sufficiency of the evidence to support the findings and judgment apply.

[4]''Subject to the provisions of this act and of any statute in that behalf, there is no implied warranty or condition as to the quality or fitness for any particular purpose of goods supplied under a contract to sell or a sale, except as follows:

''(1) Where the buyer, expressly or by implication, makes known to the seller the particular purpose for which the goods are required, and it appears that the buyer relies on the seller's skill or judgment (whether he be the grower or manufacturer or not), there is an implied warranty that the goods shall be reasonably fit for such purpose.

''(2) Where the goods are bought by description from a seller who deals in goods of that description (whether he be the grower or manufacturer or not), there is an implied warranty that the goods shall be of merchantable quality.

''(3) If the buyer has examined the goods, there is no implied warranty as regards defects which such examination ought to have revealed.

''(4) In the case of a contract to sell or a sale of a specified article under its patent or other trade name, there is no implied warranty as to its fitness for any particular purpose.

''(5) An implied warranty or condition as to the quality or fitness for a particular purpose may be annexed by the usage of trade.

''(6) An express warranty or condition does not negative a warranty or condition implied under this act unless inconsistent therewith.''

in favor of Arro and General Motors on the cross-complaint is affirmed. As Eichler failed to establish a cause of action on its cross-complaint, we need not discuss the contentions concerning the finding that it was barred from any relief on the cross-complaint by its own negligence.

Affirmed.

Shoemaker, P. J., and Agee, J., concurred.

A petition for a rehearing was denied February 28, 1969, and appellants' petition for a hearing by the Supreme Court was denied March 26, 1969. Mosk, J., did not participate therein.