[Civ. No. 32914.   Second Dist., Div. Three.   May 6, 1969.]

THOM AVNER et al., Plaintiffs and Appellants, v. LONG-RIDGE ESTATES et al., Defendants and Respondents.

Fulop, Rolston & Burns, Lawrence R. Resnick and Marvin G. Burns for Plaintiffs and Appellants.

David L. Sefman, in pro. per., Gibson, Dunn & Crutcher, Robert S. Warren, Jones & Daniels and George W. Coleman for Defendants and Respondents.

SCHWEITZER, J.—By a document entitled Order of Dismissal after Sustaining of Demurrer without Leave to Amend and Order Permitting Limited Amendment, the dismissal of plaintiffs' first six causes of action was ordered. (Code Civ. Proc., § 581, subd. 3.) Amendment of the complaint as to the seventh and eighth causes of action directed against defendant Warren Company, who is not a party to this appeal, was permitted. The appeal is being taken from the judgment of dismissal in favor of defendants.

The complaint as to which the demurrers were sustained and which is before us for consideration is captioned "Amendment to First Amended Complaint." It restates the first five causes of action of the first amended complaint and adds thereto three additional causes of action. Since the apparent intent was to supersede entirely the first amended complaint, it properly should have been captioned "Second Amended Complaint."

### Facts Alleged

Sometime prior to 1960, defendant Longridge Estates (Longridge) owned hillside property in the Santa Monica Mountains, Los Angeles County, and developed it into a tract of residential lots. Defendants D. S. Hamner (Hamner) and Donald R. Warren Company (Warren) did the general engineering and soils engineering, respectively, for the tract. In 1960, plaintiffs' predecessor in interest purchased a lot in the tract and built a house thereon. Plaintiffs purchased the house and lot on June 15, 1960.

In February 1962, a portion of the rear slope of the lot

failed. Plaintiffs employed defendant Warren to investigate the cause of the failure and repair it. It is alleged that Warren found inadequate drainage and improper compaction of fill on the rear slope; that Warren concealed these facts from plaintiffs; and that Warren informed plaintiffs that the slope failure was due only to excessive rainfall and landscape watering. Warren supervised the repairs.

In November 1965, the rear slope of the lot failed in a different location from the 1962 failure. The damages resulting from this second slope failure are the subject of plaintiffs' first, third and fifth causes of action on the theories of strict liability, negligence and building code violations, respectively.

Also, in November 1965, the lot pad settled, allegedly due to the decomposition of organic matter and insufficient compaction at the time of the lot preparation. The damages resulting from the settling of the pad are made the subject of the second, fourth and sixth causes of action, on the theories of strict liability, negligence and building code violations, respectively.

Plaintiffs filed their complaint against defendants on July 1, 1966. The first six causes of action are against defendant Longridge; the third through sixth against defendant Hamner; the seventh and eighth against defendant Warren. The demurrers to the first six causes of action were sustained without leave to amend on the ground that they were barred by the three-year period of limitations of section 338, subdivision 2, Code of Civil Procedure, and as to the first and second causes of action on the additional ground that "there is no doctrine of strict liability as to the manufacture of residential lots." Plaintiffs appeal from the judgment of dismissal entered thereafter.

### Strict Liability

Plaintiffs rely on *Kriegler* v. *Eichler Homes, Inc.* (1969) 269 Cal.App.2d 224, 227 [74 Cal.Rptr. 749] (hearing denied), holding that the doctrine of strict liability may be applied in a suit by a homeowner based on defective construction against one engaged in the mass production and sale of tract homes. In *Kriegler,* defendant had constructed over 4,000 homes in which steel tubing radiant heating systems had been installed in the concrete floor slab. Kriegler's predecessor bought one of the homes in 1952, and plaintiff purchased it in 1957. In 1959 due to corrosion, the steel tubing failed, causing

damage to plaintiff. The trial court found that regardless of negligence, defendant was liable to plaintiff on the theory of strict liability because the system, as installed, was defective. In affirming this determination, the Court of Appeal noted that the question was one of first impression and stated at page 227:

"We think, in terms of today's society, there are no meaningful distinctions between Eichler's mass production and sale of homes and the mass production and sale of automobiles and that the pertinent overriding policy considerations are the same. Law, as an instrument of justice, has infinite capacity for growth to meet changing needs and mores. Nowhere is this better illustrated than in the recent developments in the field of products liability. The law should be based on current concepts of what is right and just and the judiciary should be alert to the never-ending need for keeping legal principles abreast of the times. Ancient distinctions that make no sense in today's society and that tend to discredit the law should be readily rejected as they were step by step in *Greenman* [v. *Yuba Power Products, Inc.*, 59 Cal.2d 57 (27 Cal.Rptr. 697, 377 P.2d 897, 13 A.L.R.3d 1049)] and *Vandermark* [v. *Ford Motor Co.*, 61 Cal.2d 256 (37 Cal.Rptr. 896, 391 P.2d 168)]."

The Court of Appeal relied on *Schipper* v. *Levitt & Sons, Inc.*, 44 N. J. 70 [207 A.2d 314], wherein the purchaser of a mass-produced home sued the builder-vendor for injuries suffered as a result of a defective hot water system, and noted that it was "a defect as latent as the incorrect positioning of the pipes in the instant case." (P. 228.) In holding that the doctrine of strict liability was applicable, the New Jersey Supreme Court said: "When a vendee buys a development house from an advertised model, as in a Levitt or in a comparable project, he clearly relies on the skill of the developer and on its implied representation that the house will be erected in reasonably workmanlike manner and will be reasonably fit for habitation. He has no architect or other professional adviser of his own, he has no real competency to inspect on his own, his actual examination is, in the nature of things, largely superficial, and his opportunity for obtaining meaningful protective changes in the conveyancing documents prepared by the builder vendor is negligible. If there is improper construction such as a defective heating system or a defective ceiling, stairway and the like, the well-being of the vendee and others is seriously endangered and serious injury is foreseeable. The public interest dictates that if such injury does

result from the defective construction, its cost should be borne by the responsible developer who created the danger and who is in the better economic position to bear the loss rather than by the injured party who justifiably relied on the developer's skill and implied representation.

"Buyers of mass produced development homes are not on an equal footing with the builder vendors and are no more able to protect themselves in the deed than are automobile purchasers in a position to protect themselves in the bill of sale." (Pp. 325-326.)

As noted by the New Jersey Supreme Court in *Schipper* and our Court of Appeal in *Kriegler*, "[T]he imposition of strict liability principles on builders and developers would not make them insurers of the safety of all who thereafter came on the premises. In determining whether the house was defective, the test would be one of reasonableness rather than perfection." (*Kriegler* v. *Eichler Homes, Inc.*, 228.)

The Court of Appeal concluded its opinion in *Kriegler* by stating on pages 228-229: "As it cannot be disputed that Kriegler here relied on the skill of Eichler in producing a home with a heating system that was reasonably fit for its intended purpose, the trial court properly concluded that Eichler was liable to Kriegler on the basis of strict liability, and the judgment in favor of Kriegler must be affirmed on that ground alone."

In attempting to distinguish *Kriegler* from the instant case, defendants correctly point out that *Kriegler* related to defects in equipment installed in a house manufactured by defendant therein, that it did not concern alleged defects in the soil of real property sold by defendant, and argue that the comparison of the mass production of houses and the mass production of automobiles is sound but that no such comparison is possible with respect to the underlying soil. Defendants further state that although a land developer may grade property, cut from the soil and fill depressions, he does not alter the basic characteristics of the soil and must contend with the various natural and latent conditions which may be existent in the soil and its subsurface, and that neither the builder of houses nor the manufacturer of an automobile has such considerations.

We question the soundness of the preceding assertion. It is common knowledge that with modern grading and trucking equipment, earth is moved considerable distances for filling purposes, that it is not improbable for the imported soil to

have entirely different characteristics from those of the native soil. It is also common knowledge that geologists and soils engineers are able to determine with a reasonable degree of certainty the stability of soil from tests of the surface and subsurface, and that if adequate and proper tests are made, it is highly improbable that any condition affecting stability will remain unknown and latent.

Defendants rely on *Beck* v. *Bel Air Properties, Inc.* (1955) 134 Cal.App.2d 834 [286 P.2d 503] (hearing denied), and *Conolley* v. *Bull* (1968) 258 Cal.App.2d 183 [65 Cal.Rptr. 689] (hearing denied). In *Beck,* plaintiffs purchased a hillside lot in a tract developed by defendants and built a residence thereon. Plaintiffs alleged that two fills were negligently constructed on the hillside to the rear and above their lot in that large quantities of soil and rock were cut from the top of the slope, were pushed over the summit above their lot, were left there unsupported, and that heavy rains caused the loose soil and rocks to flow over plaintiffs' property. Among other causes of action, plaintiffs alleged absolute liability. After discussing *Green* v. *General Petroleum Corp.,* 205 Cal. 328 [270 P. 952, 60 A.L.R. 475], and other cases dealing with ultrahazardous activities wherein the doctrine of absolute liability had been imposed, the court asked itself and answered the following question at page 842:

"Should earth moving operations incident to subdividing and grading hills and slopes into building sites be grouped with escaping gas, oil drilling and dynamiting? Or, is it an activity that ordinarily can be safely carried on, if reasonable care is used?

"This court is inclined to the latter view.

"  .  .  .  .  .  .  .  .  .  .  .  .  .  .

" [T]he creation, construction and maintenance of hillside fills is a matter of common usage. Cutting, leveling and filling are the inevitable, constant and ordinary methods pursued in the development of hillside areas.

"It follows that the instant activity is not so obviously and plainly ultrahazardous as to impose liability regardless of the care used."

In *Conolley* v. *Bull, supra* (1968) 258 Cal.App.2d 183 (hearing denied), defendant build a house on a hillside lot. During construction he was advised that the underground movement of subsurface water created a spring in the area that caused slides to occur, and that he should engage a commercial soil testing laboratory to recommend a feasible drain-

age method. No soil test was made. Plaintiffs purchased the property from defendant A few months thereafter a landslide occurred, causing extensive damage to the property. Included in the several causes of action of the complaint was one in strict liability. In rejecting the application of the doctrine to real estate transactions, the court relied on *Halliday* v. *Greene,* 244 Cal.App.2d 482, 486-487 [53 Cal.Rptr. 267], wherein the Court of Appeal noted important differences between products liability and construction cases: "In the first place, the builder or contractor is seldom in a position to limit his liability by express warranties and disclaimers and thereby defeat the recovery of an occupant injured by a defective building. In the second place, it is considerably less difficult for the occupant of a building to trace the source of a defect to the builder or the contractor than it is for a consumer to trace the source of a defect through the modern, complex system of manufacture. . . . Third, . . . the most important distinction lies in the opportunity to make a meaningful inspection of the retailed product as contrasted with inspection of a building before using it."

In closing, the court in *Conolley* v. *Bull, supra* (1968) 258 Cal.App.2d 183, stated at pages 196-197: "the laws governing sales of real property, like those regulating landlord and tenant relationships, have developed along different lines from those laws governing sales of commercial goods. Thus, the Uniform Commercial Code does not treat the subject of express and implied warranties in contracts for the purchase of real property or in grant deeds. The property cases which have developed the relevant governing principles for this area of the law state no doctrine of strict liability in tort for sales of defective real estate. In view of the fact that sales of real estate normally take considerable time to transact, thus affording prospective purchasers ample time to assure themselves of the condition of the property, and in view of the distinctions pointed out in *Halliday,* we hold that the strict liability in tort doctrine of *Greenman* has no application to this case."

It is significant that in *Conolley* recovery in negligence was affirmed; its discussion of strict liability was dictum. In *Sabella* v. *Wisler,* 59 Cal.2d 21 [27 Cal.Rptr. 689, 377 P.2d 889], cited in *Conolley,* wherein a house had been constructed on loose fill, the defendant builder's liability was predicated solely upon negligence; strict liability was neither pleaded nor discussed by the court in its opinion.

Defendant Longridge submits as an additional reason for refusal to extend the doctrine of strict liability of the manufacturer of chattels to the developer of real property, the historical limitations upon the responsibility of a vendor of realty. Section 1113, Civil Code, provides that certain implied warranties or covenants, and no others, result from a grant of real property, that those listed do not include warranties or covenants respecting the condition of the soil. In *Gustafson* v. *Dunman, Inc.* (1962) 204 Cal.App.2d 10 [22 Cal.Rptr. 161], it was held that a buyer of real property has no cause of action against his vendor for breach of an alleged warranty that the property would support the house constructed thereon. In *Liberty Bldg. Co.* v. *Royal Indem. Co.* (1960) 177 Cal.App.2d 583, 588-589 [2 Cal.Rptr. 329], an action on an insurance policy, it was held that the insured could suffer no warranty liability for injuries to a house constructed on a residential lot resulting from a defect in the soil upon which the house was built.

We note, however, that in neither case was the doctrine of strict liability in tort pleaded or discussed. The argument is answered by our Supreme Court in *Greenman* v. *Yuba Power Products, Inc.* (1963) 59 Cal.2d 57, 63 [27 Cal.Rptr. 697, 377 P.2d 897, 13 A.L.R.3d 1049] : ". . . the refusal to permit the manufacturer to define the scope of its own responsibility for defective products [citations] make clear that the liability is not one governed by the law of contract warranties but by the law of strict liability in tort."

The question of the liability of a manufacturer of a lot to the ultimate occupier thereof for damages suffered by the latter as the result of latent defects in the manufacturing process appears to be one of first impression. Although factually the question could have been presented in *Beck* v. *Bel Air Properties, Inc., supra,* (1955) 134 Cal.App.2d 834, the issue was not raised. *Beck* was disposed of by a determination that absolute liability should not attach because the developer of a lot is not engaged in an ultra-hazardous activity.

The doctrine of strict liability was developed after *Beck*. (See history of its evolvement, *Greenman* v. *Yuba Power Products, Inc., supra,* (1963) 59 Cal.2d 57, 62.) The dictum in *Conolley* v. *Bull, supra* (1968) 258 Cal.App.2d 183, 196. was based on the reasoning of the court, quoted above, in *Halliday* v. *Greene* (1966) 244 Cal.App.2d 482, 486-487 [53 Cal.Rptr. 267], as to three important distinctions between products liability and construction cases. We question their soundness as

applied to the facts in the instant case. Here we have allegations that defendants manufactured the lot by cutting, grading, filling and compacting for the purpose of sale to the public and the construction of a house thereon, knowing that if said work was defective, it would cause damage to any improvements thereon; that the manufacturing process was defective in that it had inadequate provision for drainage, which caused water to accumulate between the fill and bedrock, in that it had organic matter beneath the fill which decomposed, causing the lot pad to settle; and in that it had not been sufficiently compacted, which also caused the lot pad to settle. The alleged defects were not visible or apparent to a purchaser; conceivably they were many feet beneath the surface of the lot pad. Information thereof could have been ascertained by subsurface soil tests and by inspections at the time of filling and grading. Is the purchaser of a manufactured lot under obligation to employ a soils engineer to make expensive and disruptive soil tests? We are unable to distinguish the obligation of a builder to a purchaser for a defective radiant heating system installed in a cement floor slab (*Kriegler* v. *Eichler Homes, Inc., supra*) from the obligation of a manufacturer of a lot to a purchaser for defective subsurface conditions resulting from improper filling and grading that cause instability. ▮ In view of the recent action of the Supreme Court in denying a hearing in *Kriegler,* we conclude that the manufacturer of a lot may be held strictly liable in tort for damages suffered by the owner as a proximate result of any defects in the manufacturing process.

### Statute of Limitations

▮ Plaintiffs do not seek any relief in this action in connection with the 1962 slope failure. They concede an action based thereon would be barred by the three-year period of limitations. (Code Civ. Proc., § 338, subd. 2.) They allege that the causes of action that arose from the 1965 incidents were separate and distinct from those which accrued in 1962; that they could not have been anticipated prior to November 1965, by a reasonable person in the exercise of due diligence, and that since they filed their complaint on July 1, 1966, they are within the three-year period of limitations. Defendants contend that the pleadings affirmatively admit that plaintiffs had knowledge of the alleged defects in 1962; that all causes of action accrued in 1962, and that the three-year period of limitations is a bar to their action filed in 1966.

As a general rule a cause of action arises when the wrongful act was committed and not at the time of the discovery; the statute commences to run even though a plaintiff is ignorant that he has a cause of action. (See 1 Witkin, Cal. Procedure (1954), Actions, pp. 614-615; extent of damages from fraud not fully known—*Rubino* v. *Utah Canning Co.,* 123 Cal.App.2d 18 [266 P.2d 163]; extent of personal injuries not fully known—*Sonbergh* v. *MacQuarrie,* 112 Cal.App.2d 771 [247 P.2d 133]; false arrest and false imprisonment—*Collins* v. *County of Los Angeles.* 241 Cal.App.2d 451, 454, 455 [50 Cal.Rptr. 586].) To avoid the harsh and unjust effects of this rule, the courts have made exceptions, the pertinent exception being in "[a]ctions based on progressively developing or continuing wrongs where nature, extent or permanence of the harm are difficult to discover." (1 Witkin, Cal. Procedure (1954) Actions, p. 616.) Thus, in *Bellman* v. *County of Contra Costa,* 54 Cal.2d 363 [5 Cal.Rptr. 692, 353 P.2d 300], a case involving the destruction of lateral support, the Supreme Court stated at page 369: "Further, the rule is that a new and separate cause of action arises with each new subsidence, with any applicable limitations statute running separately for each new separate subsidence." (In accord: damages due to defective furnace—*Howe* v. *Pioneer Mfg. Co.,* 262 Cal.App.2d 330 [68 Cal.Rptr. 617]; damages due to defective heating system—*Mack* v. *Hugh W. Comstock Associates, Inc.,* 225 Cal.App.2d 583, 590 [37 Cal.Rptr. 466]; damages due to diversion of water on successive occasions—*Frustuck* v. *City of Fairfax,* 212 Cal.App.2d 345, 373-375 [28 Cal. Rptr. 357]; damages due to seepage—*Nelson* v. *Robinson,* 47 Cal.App.2d 520, 529-531 [118 P.2d 350]; Prosser on Torts, 3d ed., p. 75.)

Recently our court had before it for consideration the case of *Oakes* v. *McCarthy Co.,* 267 Cal.App.2d 231 [73 Cal. Rptr. 127], a suit by a homeowner against the subdivider-builder of a tract of homes. The lot, like others in the tract, had been manufactured by cutting, filling and grading. Plaintiffs purchased the lot in January 1956, and moved into the house upon its completion in September, 1956. When they took possession, they noticed a hairline crack in the patio cement; by May 1958, it was a quarter-inch in width. In September 1956, they also noticed a hairline crack in the stucco. In January 1957, they noticed settling in the yard which caused drainage erosion on a bank. In February 1957, they observed that doors in the house were binding. Other

damage was noticed, including soil subsidence, which caused window panes and walls to crack, but the dates thereof are not noted in the opinion. Plaintiffs filed their action in December 1960. The three-year statute of limitations (Code Civ. Proc., § 338, subd. 2) was pleaded in defense. In upholding the award to plaintiffs, the court said at page 255: ''Only when the consequential damage is sufficiently appreciable to a reasonable man may we hold an owner to a duty of expeditiously pursuing his remedies. As to when the consequential damage reached this point was a question of fact. [Citations.] And the ultimate issue as to whether the cause of action for negligence was barred by the statute of limitations became a mixed question of law and fact. [Citations.] It was, therefore, proper to submit the issue to the jury under proper instructions of law.''

We hold that the allegations of plaintiffs' complaint bring the plaintiffs within the exception noted; that if plaintiffs can prove there were two new causes of action arising in 1965, their action is not barred by section 338, subdivision 2, Code of Civil Procedure; that if only a single cause existed, the one arising in 1962, as contended by defendants, then the action is barred. It is a question of fact for determination at trial, not on demurrer.

Defendants contend that plaintiffs had imputed knowledge from their agent, defendant Warren, that the entire lot and slope were defective in 1962. From the facts pleaded it would appear that Warren was an independent contractor. However, the existence of an agency is a question of fact, and one to be determined at trial. (*Brokaw* v. *Black-Foxe Military Institute*, 37 Cal.2d 274, 278 [231 P.2d 816]; *Housewright* v. *Pacific Far East Line, Inc.*, 229 Cal.App.2d 259, 265 [40 Cal. Rptr. 208].)

On appeal defendant Hamner contends that the action against him is one for negligence in the performance of personal services, similar to that of attorney malpractice; that the action accrued at the date of the alleged malpractice, not when the damage was discovered (*Shelly* v. *Hansen*, 244 Cal. App.2d 210 [53 Cal.Rptr. 20]; *Griffith* v. *Zavlaris*, 215 Cal. App.2d 826 [30 Cal.Rptr. 517]), and is therefore barred by the two-year period of limitations of section 339. subdivision 1, Code of Civil Procedure. The two-year limitation period is applicable only if the trier of fact determines that Hamner's undertaking was one solely of giving professional advice and opinions. (*Oakes* v. *McCarthy Co., supra,* 267 Cal.App.2d

231, 249.) Here, Hamner has been charged with participating in the development, production and manufacture of the lot. This allegation, coupled with allegations that it was negligently developed, produced and manufactured, is sufficient to raise a question of fact as to whether the action is barred by a statute of limitations, and if so, which one. However, it should be noted that Hamner failed to raise the question of the statute of limitations in his demurrer. The defense of the statute of limitations is waived unless it be pleaded in the answer to the complaint or is specified as a ground of general demurrer. (*Minton* v. *Cavaney,* 56 Cal.2d 576, 581 [15 Cal. Rptr. 641, 364 P.2d 473].)

In concluding our comments we emphasize that we have liberally construed the allegations of the complaint in the light most favorable to plaintiffs. In stating the facts herein, we have stated facts which have not yet been proved and may never be. Demurrer rulings ''are untrustworthy source materials for fact finders.'' (*Garlock* v. *Cole,* 199 Cal.App.2d 11, 17 [18 Cal.Rptr. 393].) Our holding may be summarized briefly by stating that under the allegations of the complaint, questions of fact are raised that must be determined by trial, not by demurrer.

Judgment of dismissal is reversed; the trial court is instructed to overrule the general demurrers to the first six causes of action and to grant defendants a reasonable time within which to plead to the amended complaint.

Ford, P. J., and Cobey, J., concurred.

A petition for a rehearing was denied May 26, 1969, and the petition of respondent Longridge Estates for a hearing by the Supreme Court was denied July 2, 1969.