[Civ. No. 40370. Second Dist., Div. Three. May 3, 1973.]

LOUIS C. BLAU, as Executor, etc., et al., Plaintiffs and Appellants, v. CITY OF LOS ANGELES et al., Defendants and Respondents.

## COUNSEL

Louis C. Blau, in pro. per., Fadem & Kanner and Michael M. Berger for Plaintiffs and Appellants.

Roger Arnebergh, City Attorney, George J. Franscell and John T. Neville, Assistant City Attorneys, Chase, Rotchford, Drukker & Bogust and Vincent Fish for Defendants and Respondents.

## OPINION

**SCHAUER (Richard), J.**\*—Plaintiffs appeal from (1) a judgment in favor of defendant City of Los Angeles, entered after a jury returned a special verdict (Code Civ. Proc., §§ 624, 625) and (2) a judgment of nonsuit after opening statement (Code Civ. Proc., § 581c) in favor of defendant Bell Petroleum Company, a corporation. In addition, plaintiffs seek appellate review of orders of the court below which determined costs. Such appellate review may be pursued. (Code Civ. Proc., § 904.1, subds. (a), (b).)

The record herein discloses that Evelyn Stein and Philip A. Stein, deceased, filed the complaint in the subject case alleging damage to their real property caused by a landslide occurring in 1966. The complaint charged in a first cause of action that Bell Petroleum Company, hereinafter referred to as "Bell," prior to the Steins' ownership of the instant real property, "owned and/or developed" the tract in which the Steins' lot was situated and "did negligently . . . and unlawfully excavate, level and improve and grade said tract and failed to provide proper or adequate drainage of said tract or lateral or subjacent support . . ." In three other causes of action against only the City of Los Angeles, hereinafter referred to as "City," the complaint alleged in part that the City negligently failed to obtain compliance with official safety requirements "regarding subdividing, developing, bulldozing, grading, filling, cutting and excavating of said tract and lot and the construction of streets and roadways adjacent thereto" (second cause of action); that the City, in the course of "installing, maintaining and constructing . . . [an] easement as a public road for the purpose of grading the same, did carelessly and negligently excavate . . . which in turn removed any lateral or other support for the lands of plaintiffs . . ." (third cause of action); and that "City willfully, deliberately and maliciously proceeded to remove brush, landscaping and natural flora . . . immediately prior to and during the height of the rainy season . . ." so that when rains fell erosion occurred (fourth cause of action). Each cause of action alleges that the acts complained of caused the landslide which damaged the property of the Steins.

Prior to trial Philip A. Stein died and Louis C. Blau, as executor of his estate, was substituted as a co-plaintiff with Mrs. Stein. After plaintiffs' opening statement at the trial, Bell's motion for nonsuit was granted. Thereafter the case proceeded through trial only against the City and, upon express abandonment by plaintiffs of all other theories of liability, was submitted to the jury solely as a suit in inverse condemnation. The special verdict, rendered 9 to 3, resulted in a judgment in favor of the City.

---

*Assigned by the Chairman of the Judicial Council.

On this appeal plaintiffs contend that (1) a City geologist's expert opinion as to cause of the landslide should have been stricken as mere speculation, (2) an erroneous instruction regarding causation misled the jury, (3) orders allowing costs to the City were improper and (4) recent case law imposing strict liability on real property developers requires re-examination of the rule relied upon by the trial court in granting the motion for nonsuit.

## STATEMENT OF FACTS

In 1937 Bell[1] owned and subdivided the tract wherein plaintiffs' property is located. As a condition of the City's approving the subdivision, Bell was required to submit subdivision maps and plans for Bellagio Road and Estrellita Way and to obtain City approval thereof. Such maps and plans were approved by the City in 1937, and in 1938 the work involved in the road construction was completed and accepted by the City. Thereupon, Bellagio Road and Estrellita Way became dedicated public streets of the City and have remained City streets since such time.

In constructing the streets in 1937 and 1938 the toe (or bottom) of the slope which supported the subject hilltop property was cut. Such property, upon which the Steins in 1961 built a residence, swimming pool and bomb fall-out shelter, was purchased by them after a Mr. MacLean, a predecessor in interest, in 1954 had graded the subject lot and created a building site of both cut and fill material. Although a fault existed on plaintiffs' property no slides were reported until 1966 when, after heavy rainfall, earth from the supporting hillside subsided, falling down onto Bellagio and Estrellita and thereby damaging plaintiffs' property.

In support of plaintiffs' contention as to cause of the landslide, plaintiffs' expert witnesses testified that factors involved included excessive water in the soil, geologic conditions and development of the building site with fill placement thereon, but that cutting the toe of the slope in construction of the streets was the causal element which should be characterized as "most serious," "principal," "most important," "key," and "likely" a *sine qua non* of the slide. In response, a defendant's expert gave an opinion that "[t]he substantial factors that led ultimately to the failure began with the initial development of the subdivision back in the mid and late thirties, with the grading of essentially flat, poorly draining building sites . . . subsequent cuts made for construction of the site . . . and poor mainte- nance of that property for drainage . . . the placing of compacted fill . . . installation of extensive irrigation systems . . . [but] the primary

---

[1]In 1937 the respondent Bell was named "Alphonzo E. Bell Corporation" and sub- sequently its name was changed to the present "Bell Petroleum Company."

cause was applied water from sources other than natural causes." He also testified that cutting the toe of the slope was "a minor or a negligible causal factor . . . of the lesser significance of the factors that contributed to the failure." Another expert witness for the City, a geologist, Robert C. Fox, testified that, "It just doesn't seem logical to me to assume that removing a little piece of land below a slope that had withstood very heavy rainfalls would have any effect on this thing." He also gave evidence that in his opinion "the substantial cause of the slide . . . [was] . . . the added weight of water due to the unusually high rainfall that year plus . . . other sources of water." Mr. Fox then testified with regard to such other sources of water that records of the Los Angeles Department of Water and Power meter readings revealed that the Stein property had consumed, for years prior to and abruptly ending at the time of the slide, more than three times the amount of water utilized by similar properties in the same neighborhood and "[s]o somewhere between the meter and somewhere on the property, in either the main line or somewhere in the house, there was either a leak or the people used a fantastic quantity of water."

## THE EXPERT OPINION

Plaintiffs moved to strike the opinion of Mr. Fox on the ground that it was based on conjecture and speculation since he had assumed the existence of a water leak and absorption into the soil of water therefrom only because of the information he had acquired with regard to the inordinately great consumption of water reflected by the meter readings. The trial court denied the motion and plaintiffs contend such ruling was erroneous.

■ We reject such contention of plaintiffs. Based upon the evidence of an unusually high volume of water attributed to the Stein property, one reasonable hypothesis was that a leak existed; and a further reasonable hypothesis from the evidence was that some of such water infiltrated the soil rather than passing off through sewer or drainage systems.

Mr. Fox testified in support of his hypotheses with regard to a water leak that he had visited the site on three occasions and examined the topography and surrounding area; that he looked at other homesites in the neighborhood and examined geologic and engineering information regarding soil, rainfall and infiltration characteristics; that he inspected the landscaping, obtained information as to the number of occupants on the Stein property and considered the swimming pool and possible use of water for domestic and irrigation purposes as well as evaporation and the relative size of the Stein lot; and that after the landslide the water consumption for the Stein property "went down 300 percent . . . to . . . the average of everybody else in the neighborhood."

In view of the likelihood that similar evidence is offered at a retrial we point out that the opinion of Mr. Fox was based not on mere conjecture but ". . . on hypotheses that find support in the evidence. [Citations.]" (*Pacific Gas & E. Co.* v. *G. W. Thomas Drayage etc. Co.*, 69 Cal.2d 33, 44 [69 Cal.Rptr. 561, 442 P.2d 641, 40 A.L.R.3d 1373]; see also *Rosenberg* v. *Goldstein,* 247 Cal.App.2d 25, 30-31 [55 Cal.Rptr. 306].)

## THE CAUSATION INSTRUCTIONS

■ Plaintiffs assert that prejudicial error resulted from the giving of the jury instruction quoted below[2] because, they claim, it was confusing and misstated the law. The instruction, given over plaintiffs' objection, was entitled "COURT'S REVISION OF BAJI 2.60" and marked "Given On Court's Motion." The argument which plaintiffs emphasize is that the instruction improperly injects the issue of contributory negligence into an inverse condemnation suit.

But the instruction does not relate to any standard of care imposed upon the parties. Indeed, even reasonable, non-negligent conduct of plaintiffs or their predecessors would preclude plaintiffs' recovery under the last quoted paragraph of the instruction if it were found to be "*a* substantial cause" of the landslide. (Italics supplied.) Thus, the real issue is not one of contributory negligence but whether the jury was properly instructed

---

[2]"COURT'S REVISION OF BAJI 2.60

In this case it is an admitted fact that Bellagio Road was created in 1937 as designed and constructed, and then was accepted and dedicated as a public street of the City of Los Angeles. It is also an admitted fact that a landslide occurred on Bellagio Road in the vicinity of Estrellita Way on February 10, 1966.

Although plaintiffs in their pleadings have made allegations that the defendant City and its representatives were negligent in various ways relating to the creation, construction and maintenance of Bellagio Road, they have abandoned such claims of negligence and now seek to recover damages against defendant City solely in reliance upon the provisions of Article I, Section 14 of the Constitution of the State of California which, so far as pertinent here, reads as follows:

'Private property shall not be taken or damaged for public use without just compensation having first been made to . . . the owner . . .'

In these circumstances, plaintiffs have the burden of establishing by a preponderance of the evidence all of the facts necessary to prove the following issues:

1. That a substantial cause of the landslide on February 10, 1966 was the creation of Bellagio Road as designed and constructed;

2. If No. 1 is answered in the affirmative, was the private property of plaintiffs damaged as a result thereof; and

3. If both of the foregoing two issues are answered in the affirmative, what is the amount of the damages suffered by plaintiffs?

*In case you find that a substantial cause of said landslide was attributable to conduct on the part of plaintiffs or their predecessors in interest in the subject property, then you may not award damages against the defendant City of Los Angeles.*" (Italics supplied.)

on the issue of contributory or concurring causation in these inverse condemnation proceedings.

"In order to recover plaintiffs must prove their property has been taken or damaged for public use. The crux of this contention is whether or not the damage to the property was 'proximately caused' by the public improvements. (See *Albers* v. *County of Los Angeles* (1965) 62 Cal.2d 250 [42 Cal.Rptr. 89, 398 P.2d 129].) As noted by one author, this 'qualification— requiring that the damage be proximately caused by the public improvement as designed and constructed — involves a troublesome conceptual premise.' (Van Alstyne, *Inverse Condemnation: Unintended Physical Damage,* 20 Hastings L.J. 431, 435.) But as that author also notes (at p. 436), with supporting citations, proximate cause 'requires a convincing showing of a "substantial" cause-and-effect relationship which excludes the probability that other forces alone produced the injury.' " (*Olson* v. *County of Shasta,* 5 Cal.App.3d 336, 340 [85 Cal.Rptr. 77].)

Our Supreme Court also has referred to the concept of "substantial" causation in inverse condemnation by the following footnote 9 in *Holtz* v. *Superior Court,* 3 Cal.3d 296, at page 304 [90 Cal.Rptr. 345, 475 P.2d 441]: "Professor Arvo Van Alstyne has aptly pointed out that the 'proximate causation' terminology utilized in *Albers* is potentially confusing, because the 'proximate cause' doctrine of tort law is often defined in terms of 'foreseeability,' whereas the *Albers* decision, imposing liability absent foreseeability, could not have intended such a construction. (Van Alstyne, *Inverse Condemnation: Unintended Physical Damage* (1969) 20 Hastings L.J. 431, 435-438.) We recognize the greater precision, as Professor Van Alstyne contends (*id.* at p. 436) in restating this element of the *Albers* test in terms of 'substantial' causation. (See also Mandelker, *Inverse Condemnation: The Constitutional Limits of Public Responsibility,* 1966 Wis.L.Rev. 3, 52.) In the instant case, however, defendants have raised no contention concerning an absence of the requisite degree of causation; we believe it proper to defer any change in language to a case which better reveals the competing considerations on the causation issue."

Professor Van Alstyne comments (*supra,* 20 Hastings L.J. at p. 436) that, "[p]roof that the injurious consequences followed in the normal course of subsequent events, and were produced predominantly by the improvement, seems to be the focus of the judicial inquiry." But he recognizes that ". . . a proximate, although concurrent, cause of the resulting damage . . . [is] . . . a basis of inverse liability." (*Id.* at p. 438.)

■ The concept that legal responsibility may be grounded on a concur-

ring cause, if substantial, is well established in tort law. (*Apodaca* v. *Haworth,* 206 Cal.App.2d 209, 213-214 [23 Cal.Rptr. 461]; 2 Witkin, Summary of Cal. Law (7th ed. 1960) Torts § 286, pp. 1485-1486; Prosser, The Law of Torts (3d ed. 1964) ch. 9, pp. 282-330; Rest.2d Torts, § § 431-433, pp. 428-434.) And such concept recognizing multiple operative causes logically cannot be excluded from inverse condemnation principles.

In the case at bench, in addition to the instruction heretofore quoted, the jury was instructed that, "A legal cause of an injury is a cause which is a substantial factor in bringing about the injury." (BAJI No. 3.76.) But no other instruction was given to define the relationship between "substantial factor" and "substantial cause" or to indicate legal recognition or effect of concurring causes.[3]

The manifest result of the instructions given was to preclude plaintiffs from recovery if they or their predecessors in title were found to have made some "substantial" contribution to the forces which produced the landslide even though the street development was found to be a substantial contributing factor but for which the slide would not have occurred. Both logic and the evidence herein as to several causal factors impel us to the conclusion that there well may be more than one substantial factor and even more than one *sine qua non* or "substantial cause" operating to produce property damage from earth movement. Since under the above referenced legal principles of causation, each such important causal element is legally responsible notwithstanding the contribution of another, the last quoted paragraph of the "COURT's REVISION OF BAJI 2.60" instruction is erroneous.[4]

---

[3]For example, BAJI Nos. 3.77 and 3.78 on concurring causes.

[4]The trial court recognized the problem of cause in the instructions in the following colloquies: "THE COURT: I haven't found one way or the other it is or is not. But I think it could be an injustice to allow plaintiff to recover where he shows that the public body has done certain things which, absent any behavior on his part, would have resulted in no injury. But when evidence is produced that shows that the two worked together to produce the injury, is plaintiff allowed to recover?"

"THE COURT: I will handle it the best way I can by giving the instruction on the theory of liability and state that if action or conduct by the claimant caused the injury or was a proximate or legal or substantial cause of the injury, plaintiff may not recover. I think I can tell them they have an alternative. [¶] MR. STOCKER [plaintiffs' counsel]: But isn't it true and doesn't one of the BAJI instructions which we are not giving say there may be more than one proximate cause of an injury? [¶] THE COURT: Yes. [¶] MR. STOCKER: Isn't your Honor really ruling that contributory negligence is a defense when you say that if any act—[¶] THE COURT: I am not saying that eo nomine. It is the same concept."

"MR. STOCKER: I would like the record to show I believe there is in a sense an instruction of contributory negligence being made, and I do object to it. [¶] THE

Although not suggested by respondent City, inquiry should be made as to whether the special verdict[5] establishes that the jury was not misled by the erroneous instruction. The first interrogatory to the jury was framed in terms of "*the* substantial cause of the landslide of plaintiffs' property." (Italics supplied.) The use of the definite article, "the," as opposed to the indefinite and distributive "a" conveyed to the jury the impression that only one cause could be found to be "substantial" and thus only one cause was legally cognizable. Since the jurors were never instructed that there may be more than one responsible "substantial cause," it was logical for them to have reasoned that although the street development was "*a* substantial cause" it was no more significant in causation than other factors (such as the conduct of plaintiffs or their predecessors)[6] and hence was not "*the* substantial cause" required by the special verdict. Thus, insofar as the jury believed, as the evidence strongly suggested, that the landslide was a result of a combination of substantial causal forces it logically could not single out the street development as "the substantial cause" and was thus led to answer the special verdict interrogatory in the negative though finding such street development to be "a substantial cause" of plaintiffs' damage.

Even if we assume that the jurors disregarded the court's use of the definite article and understood the special verdict's first interrogatory to inquire whether the street development was a legally cognizable cause of the

COURT: In the one I am giving? [¶] MR. STOCKER: Yes, your Honor. [¶] THE COURT: I think I know what you mean. It is the last paragraph in the instruction. [¶] MR. STOCKER: Yes, your Honor. [¶] THE COURT: In all fairness, I felt if the substantial causation was on the part of the plaintiff or his predecessor, I do not think there is a right of recovery. I think that is within the constitutional privilege."

[5]"We, the jury, find and answer as follows:

1. Was the creation of Bellagio Road and Estrellita Way as designed and constructed the substantial cause of the landslide of plaintiffs' property?

Yes_____

No  *No*

2. The amount of damages sustained by plaintiffs as a result of the landslide is

$_____.

[Note: This part 2 shall be completed only in case your answer to part 1 is 'yes.']"

[6]In closing argument, the City's counsel stated as follows: ". . . You have a city road that has been in there from 1937 up through 1966. Before Mr. Stein built his house there, nothing occurred. Mr. Stein built his house, put fill in there. He started using this exceptional amount of water. In addition to that, we had unusually heavy rainfall going into and just immediately preceding the time of this slide. He had his house. He had his fill. He had an extraordinary amount of water into that ground. This in turn is added to this, according to Mr. Stein's own testimony, tremendous rainfalls. The slide occurs. [¶] Doesn't it seem strange to you that this would occur under the circumstances? [¶] Stein's activities, I submit to you, on the premises is a substantial factor, substantial cause of this slide. I don't see how any other reasonable conclusion can be reached."

landslide, the error in "COURT'S REVISION OF BAJI 2.60" is not vitiated. Inasmuch as the "Note" in the special verdict form directed the jurors to award damages if they answered the first interrogatory affirmatively they were urged to answer negatively by the last quoted paragraph of "COURT'S REVISION OF BAJI 2.60" which stated ". . . you may not award damages against the defendant City of Los Angeles," if conduct of plaintiffs or their predecessors was found to be a substantial cause of the slide. Hence, though the street development was determined to be a substantial cause or even the most significant cause, in order to avoid assessing damages the jury was constrained to answer the interrogatory in the negative upon finding conduct of plaintiffs or their predecessors which was a substantial cause of the slide.[7] Consequently, the special verdict did not remedy the error in the previously quoted last paragraph of the instruction titled "COURT'S REVISION OF BAJI 2.60."

█ Plaintiffs raise one further objection to such paragraph of the subject instruction, namely, because Bell was one of plaintiffs' "predecessors in interest" and hence, plaintiffs assert, the jury was improperly instructed to return a verdict for the City if Bell's developmental activities including the street design and construction were found to be "a substantial cause" of the landslide.[8] The well-established rule imposes inverse condemnation liability on a public entity which has approved and accepted, for a public purpose, work performed by a subdivider or private owner of property. (*Sheffet* v. *County of Los Angeles*, 3 Cal.App.3d 720, 734-735 [84 Cal. Rptr. 11] and cases collected therein.) Inasmuch as the City approved Bell's subdivision maps and plans regarding the subject streets and accepted Bell's work in constructing the streets then dedicated to the City, recovery against the City cannot be foreclosed simply by Bell's developmental activities which in fact, under the aforementioned rule, provide the very basis of the inverse condemnation suit against the City. The trial court doubtlessly did not intend inclusion of Bell as one of the "predecessors in interest" but in view of the evidence to that effect the jury must have been confused if not misled by the instruction.

The opinions of plaintiffs' experts as to causation were to the effect that the street development excavation exposed the bedding planes of the hillside soil, removing lateral support and providing a condition upon which other factors, such as water lubrication, fill placement and geologic structure, operated to produce the slide. In short, plaintiffs' case, as submitted

---

[7]As indicated by the City's final argument (see fn. 6, *supra*) and the evidence recited, the jury was presented with several causal elements, singly and in combination, attributable to the conduct of plaintiffs or their predecessors, namely fill placement, weight of structures erected and water discharged onto the subject property.

[8]City's brief does not respond to this well-taken contention of plaintiffs.

to the jury, was based on a theory of concurring substantial causal elements. The effect of the erroneous instruction was to remove from the jury's consideration plaintiffs' theory of liability and to require the jury to return a special verdict favorable to the City if either the development and use of the building site or Bell's street development was a substantial cause of the landslide. We conclude that the portion of the instruction to which plaintiffs objected is a misstatement of the applicable law, and since the issue of causation was at the heart of plaintiffs' case the error resulted in a miscarriage of justice requiring reversal. "We are satisfied that in this case this error must be held prejudicial. The evidence in the case was . . . sharply conflicting. . . . Where it seems probable that the jury's verdict may have been based on the erroneous instruction prejudice appears and this court 'should not speculate upon the basis of the verdict.' (*Oettinger* v. *Stewart,* 24 Cal.2d 133, 140 [148 P.2d 19, 156 A.L.R. 1221]; also *Miller* v. *Peters,* 37 Cal.2d 89, 95 [230 P.2d 803].) The fact that only the bare number of jurors required to reach a verdict agreed upon the verdict for defendants lends further support to the probability that the erroneous instruction was the factor which tipped the scales in defendants' favor." (*Robinson* v. *Cable,* 55 Cal.2d 425, 428 [11 Cal.Rptr. 377, 359 P.2d 929].)

## THE ORDERS DETERMINING COSTS

■  Plaintiffs complain of the post-judgment orders of the trial court which granted the City's motion to strike plaintiffs' cost bill and denied plaintiffs' motion to tax costs claimed by the City. Respondent City concedes the rule "awarding costs to the condemnee in a condemnation action" but contends that the rule is inapplicable to the case at bench because this suit was neither pleaded nor tried on the theory of inverse condemnation and plaintiffs were unsuccessful in the trial court. The pertinent rules are stated in *In re Redevelopment Plan for Bunker Hill,* 61 Cal.2d 21, 70-71 [37 Cal.Rptr. 74, 389 P.2d 538], wherein it is indicated that the basic rule when eminent domain principles apply is that property owners have ". . . a constitutional right to recover costs, as otherwise they would be 'deprived of the full measure of compensation to which' they were entitled." (*Id.* at p. 70.) "Where neither pleadings nor evidence in an action involve a claim to a right to take private property for public use, it is held that eminent domain principles do not apply and that . . . costs are properly levied against plaintiff owners. . . . (*Crum* v. *Mt. Shasta Power Corp.* (1932) 124 Cal.App. 90, 95 [12 P.2d 134].) [¶] . . . Public use is, however, one of the issues which owners reluctant to give up their property may justifiably raise in eminent domain proceedings as well as in actions in inverse condemnation or 'in the nature of eminent domain.' Even though

they may not prevail on this issue in either trial court or on appeal, it appears from the most recent expressions of the court that they are entitled to be free from costs in litigating it. (*Collier* v. *Merced Irr. Dist.* (1931) *supra*, 213 Cal. 554, 572 [2 P.2d 790]; *Peabody* v. *City of Vallejo* (1935) *supra*, 2 Cal.2d 351, 380 [40 P.2d 486].)" (61 Cal.2d at pp. 70-71.)

Although the pleadings in the instant case do not expressly mention "eminent domain" or "condemnation," inverse or otherwise, the evidence in the case converted it into a suit for inverse condemnation and it was submitted to the jury solely on that theory. The complaint herein, particularly the third cause of action, makes it clear that plaintiffs were asserting physical damage to their real property caused by a public street development excavation for which the City was responsible. Moreover, plaintiffs' counsel in his opening statement indicated that his theory was inverse condemnation, and many months before the trial plaintiffs' attorneys filed and served the other parties litigant with pretrial documents which disclosed and expressly named the "eminent domain" and "inverse condemnation" nature of their theory.

Further, the issues tried in the case at bench were whether plaintiffs' damages resulted from the public street development and if so the amount of the damages. The issue as to causation is tantamount to whether there was public use of plaintiffs' property. (See *In re Redevelopment Plan for Bunker Hill, supra,* 61 Cal.2d 21, 71.)

We conclude that the instant suit was tried as a case involving eminent domain principles and hence plaintiffs, though unsuccessful in the trial court, were constitutionally entitled to be free of costs in litigating the issue of whether development of a public street caused damages to their real property. (See *Collier* v. *Merced Irr. Dist.,* 213 Cal. 554, 572 [2 P.2d 790].)

### The Nonsuit After Opening Statement

■ Plaintiffs appeal from the judgment of nonsuit after opening statement entered in favor of respondent Bell on the ground that the law of developer liability should be re-examined in light of two recent cases which impose strict liability on developers of real property for defects in the construction of homes (*Kriegler* v. *Eichler Homes, Inc.,* 269 Cal. App.2d 224, 226-229 [74 Cal.Rptr. 749]) and in the grading of lots (*Avner* v. *Longridge Estates,* 272 Cal.App.2d 607, 609-615 [77 Cal. Rptr. 633].)

In his opening statement plaintiffs' counsel asserted that the evidence would show that "the public street, as designed . . . and prepared by

the developer . . . with . . . city permits . . . was offered to the city and accepted by the city" and with "some help from . . . some catalyst" caused the landslide. He further stated that the evidence would create an "inference that the people who made this cut and created this street either knew that they were creating a hazard that might take many years to realize itself or if they didn't know they should have known had they paid attention."

The trial court granted Bell's motion for nonsuit, relying upon *Sheffet v. County of Los Angeles, supra,* 3 Cal.App.3d 720, for the proposition that where the public entity approves and accepts as a public improvement private construction by a subdivider, "the public entity, not the subdivider, is liable in an inverse condemnation suit. (*Eachus v. City of Los Angeles,* 130 Cal. 492 [62 P. 829, 80 Am.St.Rep. 147]; *Steiger v. City of San Diego,* 163 Cal.App.2d 110, 113 [329 P.2d 94]; *Anderson v. Fay Improv. Co.,* 134 Cal.App.2d 738, 745 [286 P.2d 513].)" (3 Cal.App.3d at p. 735.)

Plaintiffs do not contend that the existing rule is otherwise or that the opening statement indicated any basis for developer liability which would remove the case from the aforementioned *Sheffet* principle. Instead, plaintiffs point out that "[a]ll of the cases relied on by *Sheffet* and *Steiger* (which established the principle that once a developer dedicates a project to the Government the developer bears no liability for injuries caused by the construction of the project) were decided before 1969" and urges that "[a]fter *Kriegler* [9] and *Avner* [10] [in 1969] when the courts decreed that developers are absolutely liable for damages caused by the construction of their projects, the rule of only City liability is an anachronism." Plaintiffs concede that *Sheffet* was decided subsequent to *Kriegler* and *Avner* but argue that: "The uncritical application of outdated law in *Sheffet v. County of Los Angeles* (1970) 3 Cal.App.3d 720 ought to be re-examined by this Court. It is clearly out of step with the rapidly evolving current law."

We disagree with plaintiffs' contention that after *Kriegler* and *Avner* there is no sound policy supporting the *Sheffet* principle. The interposition of a public entity between the developer and the user of real property provides the basis for continuation of the *Sheffet* rule.

Both *Kriegler* (*supra,* 269 Cal.App.2d at p. 228) and *Avner* (*supra,* 272 Cal.App.2d at pp. 610-611) cited and quoted from *Schipper v. Levitt & Sons, Inc.,* 44 N.J. 70 [207 A.2d 314] as follows: " 'When a vendee buys a development house from an advertised model, as in a Levitt or in

---

[9]*Kriegler v. Eichler Homes, Inc., supra,* 269 Cal.App.2d 224, 226-229.

[10]*Avner v. Longridge Estates, supra,* 272 Cal.App.2d 607, 609-615.

a comparable project, he clearly relies on the skill of the developer and on its implied representation that the house will be erected in reasonably workmanlike manner and will be reasonably fit for habitation. *He has no architect or other professional adviser of his own, he has no real compe-tency to inspect on his own, his actual examination is, in the nature of things, largely superficial, and his opportunity for obtaining meaningful protective changes in the conveyancing documents prepared by the builder vendor is negligible.* If there is improper construction such as a defective heating system or a defective ceiling, stairway and the like, the well-being of the vendee and others is seriously endangered and serious injury is fore-seeable. The public interest dictates that if such injury does result from the defective construction, its cost should be borne by the responsible developer who created the danger and who is in the *better economic posi-tion to bear the loss* rather than by the injured party who justifiably relied on the developer's skill and implied representation' (Pp. 325-326.) [¶] *'Buyers of mass produced development homes are not on an equal footing with the builder vendors* and are no more able to protect themselves in the deed than are automobile purchasers in a position to protect themselves in the bill of sale.' " (Italics supplied.)

A public entity is "on an equal footing" with a developer, not only as to "economic position to bear the loss," but also because the public agency itself participates in the development through competent inspection by its own professional advisers and through its mandatory requirements of sub-mission of plans, maps and data for any "protective changes" it may require before granting its legally required authorization and considered approval. (See *Sheffet* v. *County of Los Angeles, supra,* 3 Cal.App.3d at p. 735.) Hence, we conclude that the *Sheffet* rule, relied upon by the trial court, is still viable and the motion for nonsuit after opening statement was correctly granted.

## CONCLUSION

The judgment of nonsuit after opening statement in favor of respondent Bell is affirmed. The judgment, entered upon the return by the jury of a special verdict, in favor of respondent City is reversed. The post-judgment orders determining costs are reversed with directions to the trial court to enter orders (1) denying respondent City's motion to strike plaintiffs' cost bill and (2) granting plaintiffs' motion to tax costs claimed by the City.

Cobey, Acting P. J., and Allport, J., concurred.

The petition of respondent City of Los Angeles for a hearing by the Supreme Court was denied June 28, 1973.