WARNER/ELEKTRA/ATLANTIC COR-
PORATION; Warner Communications
Inc.; and Fireman's Fund Insurance
Co., As Subrogee for Warner/Elek-
tra/Altantic Corporation and Warner
Communications Inc., Plaintiffs,

v.

COUNTY OF DuPAGE, ILLINOIS,
Defendant.

No. 83 C 8230.

United States District Court,
N.D. Illinois, E.D.

July 18, 1991.

See also, 762 F.Supp. 784.

Thomas J. Skeffington and Kevin P. Caraher, Clausen Miller Gorman Caffrey & Witous, P.C., Chicago, Ill., for plaintiffs.

Byron D. Knight, Charles C. Hoppe, Jr., and Mark V. Puccio, Knight, Hoppe, Fanning & Knight, Ltd., Des Plaines, Ill., for defendant.

## MEMORANDUM OPINION AND ORDER

ILANA DIAMOND ROVNER, District Judge.

### I. INTRODUCTION

Plaintiffs Warner/Elektra/Atlantic Corporation and Warner Communications, Inc. (collectively, "Warner"), together with their insurer, Fireman's Fund Insurance Co. ("Fireman's Fund"), brought this action to recoup the losses they sustained when the warehouse which Warner leased in Bensenville, Illinois was flooded on two occasions in the summer of 1982. The flooding damaged or destroyed a number of record albums, cassettes, and eight-track tapes stored in the warehouse. All defendants except the County of DuPage, Illinois ("DuPage"), settled with plaintiffs in advance of trial.[1] Plaintiffs asserted two claims against DuPage, one sounding in negligence and the other in inverse condemnation. In essence, the theory of plaintiffs' case against DuPage was that when DuPage had widened and resurfaced a segment of Thorndale Road adjacent to the Warner property in the 1970s and reconfigured a drainage culvert under the roadway, it had created conditions which, during two heavy rainstorms in 1982, caused water to overflow a drainage canal and flood the Warner property.

On March 22, 1991, after 11 days of trial, the jury returned a special verdict in favor of plaintiffs on both claims. In full, the special verdict form was completed as follows:

### SPECIAL VERDICT FORM

A. As to plaintiffs' negligence claim:

1. Was the County of DuPage negligent as stated to you in these instructions?

Yes X

No _

2. If the answer to No. 1 is yes, was the negligence of DuPage County a proximate cause of damage to the plaintiffs?

Yes X

No _

3. If you answered yes to numbers 1 and 2, were the plaintiffs contributorily

---

1. These settlements were the culmination of years of protracted negotiations and more than 20 settlement conferences with the Court. Making the settlement negotiations more complex than they might have been otherwise was a parallel state court action between defendant Klefstad Engineering Co. and its professional liability insurance carriers. Ultimately, in order to facilitate settlement, this Court, together with Judge Richard L. Curry of the Illinois Circuit Court, held a joint pretrial conference on September 7, 1990 with the parties to both actions.

negligent as stated to you in these instructions?

Yes X

No _

4. If you answered yes to number 3, was such contributory negligence a cause of plaintiffs' own damage?

Yes X

No _

5. If you answered yes to number 4, assuming that 100% represents the total combined negligence of all persons or entities whose negligence proximately contributed to the plaintiffs' damage, including the plaintiffs and DuPage County and all other persons and entities, what percentage of such negligence do you find is attributable solely to the plaintiffs?

70%

B. As to plaintiffs' inverse condemnation claim:

1. Did the 1978 elevation of Thorndale Road by or under the direction of the County of DuPage proximately cause water to accumulate and overflow the water drainage canal onto the Warner property?

Yes X

No _

2. Did the 1978 extension and modification of the culvert underneath Thorndale Road by or under the direction of the County of DuPage proximately cause water to accumulate and overflow the water drainage canal onto the Warner property?

Yes X

No _

3. If you answered yes to No. 1 or No. 2 or both, did the accumulated and overflowing water cause damage to the plaintiffs' property?

Yes X

No _

Three matters remain before the Court at this juncture. First, the Court must make the ultimate determination, in light of the jury's special verdict as to plaintiffs' inverse condemnation claim, whether or not there has been a compensable taking entitling plaintiffs to compensation. Second, there is a dispute as to whether comparative fault principles apply to inverse condemnation, so as to require a reduction of the damages which plaintiffs may recover under that claim commensurate with the degree of plaintiffs' contributory negligence. Finally, there is a further dispute between the parties as to whether or not the Illinois Contribution Among Joint Tortfeasors Act, Ill.Rev.Stat. ch. 70, ¶ 302(c) (1989) (the "Contribution Act"), applies to the inverse condemnation claim, such that the amounts which plaintiffs have previously obtained from DuPage's co-defendants in settlement must be set off against plaintiffs' recovery under this claim as they are against recovery under the negligence claim. The Court takes each matter in turn below.

## II. ANALYSIS

### A. *Liability on the Inverse Condemnation Claim*

In the midst of the trial of this case, DuPage's counsel suggested for the first time that the plaintiffs' inverse condemnation claim presented a legal issue which properly was for the Court, rather than the jury, to decide. In response to this articulated concern, and consistent with precedent holding that there is no right to a jury trial on a determination of liability on an inverse condemnation claim, the Court determined that the best course would be to reserve the ultimate determination of liability to itself, but submit factual inquiries underlying this determination to the jury. *See* Minute Order dated March 15, 1991; *see generally Marshall v. Dept. of Water & Power of City of Los Angeles,* 219 Cal. App.3d 1124, 268 Cal.Rptr. 559, 568–69 (1990). After DuPage's counsel subsequently declined plaintiffs' suggestion that

the entire claim be submitted to the Court, the special verdict form was revised to include inquiries directed to the matter of proximate cause. These inquiries were patterned upon those set forth in *Skeen v. State,* 550 S.W.2d 713, 715 (Tex.Civ.App. 1977), which concerned an inverse condemnation claim based upon facts comparable to those underlying plaintiffs' claim in this case.

■ As set forth above, the jury affirmatively answered each of the inquiries regarding plaintiffs' inverse condemnation claim. That is, the jury found that both the 1978 elevation of Thorndale Road and the modification and extension of the culvert beneath it caused water to accumulate and overflow the water drainage canal onto the Warner property, and that the flooding in turn caused damage to plaintiffs' property. In light of these findings, which establish that DuPage's conduct in making modifications to public improvements was a proximate cause of damage to Warner's property, the Court finds that there has been a compensable damaging of Warner's personal property for a public use [2] and that DuPage is therefore liable to plaintiffs in inverse condemnation. *Cf. Hillsborough County v. Gutierrez,* 433 So.2d 1337, 1340 (Fla.App.1983) (in inverse condemnation action, where court found that drainage ditches adjacent to plaintiffs' property were constructed by county in such a way as to create flood conditions on the property, plaintiffs were entitled to recover value of personal property damaged by flooding); *Skeen,* 550 S.W.2d at 715 (where jury found that elevation of highway and manner of construction of culverts and service roads caused an overflow of flood waters onto plaintiffs' property on two occasions, resulting in damage to plaintiffs' real and personal property, plaintiffs were entitled to recover damages on theory of inverse condemnation); *Granone v. County of Los Angeles,* 231 Cal.App.2d 629, 42 Cal.Rptr. 34, 46 (1965) (where evidence disclosed that drainage channel and culverts had not been designed and constructed consistently with sound engineering practice and were negligently maintained, resulting in accumulation of debris, blockage of flow during rainstorm, and flooding of plaintiffs' land and destruction of plaintiffs' crops, defendants were liable in inverse condemnation). *See also Marshall,* 268 Cal.Rptr. at 567 ("a governmental entity may be held strictly liable, irrespective of fault, where a public improvement constitutes a substantial cause [3] of the plaintiff's damages even if only one of several concurrent causes").[4]

**2.** DuPage has not contended that damage resulting from its work upon Thorndale Road and the culvert does not constitute a taking for a public use. *Cf. Marin v. City of San Rafael,* 111 Cal. App.3d 591, 168 Cal.Rptr. 750, 752 (1980):

"'Public use' ... is a use which concerns the whole community or promotes the general interest in its relation to any legitimate object of government." The construction and maintenance of storm drainage systems are matters of "public policy," and such a system created by a public entity becomes a "public improvement" and a "public use." "Drainage systems concern the whole community." (Citations omitted.)

**3.** The California courts have rephrased the "proximate cause" test traditionally employed in inverse condemnation actions to one of "substantial cause," so as to ensure that a governmental entity will not be held liable for injuries which were produced *solely* by an intervening or superseding cause. *See Belair v. Riverside County Flood Control District,* 47 Cal.3d 550, 253 Cal.Rptr. 693, 697–98, 764 P.2d 1070, 1075 (1988). Even under this modified test, however, a public entity may be held liable on a claim of inverse condemnation when a public improvement is one of several concurrent causes of damage to the plaintiff's property. *See* 253 Cal. Rptr. at 698, 764 P.2d at 1075, *citing, inter alia, Ingram v. City of Redondo Beach,* 45 Cal.App.3d 628, 633–34, 119 Cal.Rptr. 688, 692 (1975) (where collapse of municipal sump released flood of water onto plaintiffs' properties, city could be held liable on claim of inverse condemnation despite other factors which contributed to the flood, absent a finding that these other factors were the sole cause of plaintiffs' damages).

**4.** In ruling that DuPage is liable to plaintiffs on the inverse condemnation claim, the Court incorporates all of its earlier opinions and orders addressing various issues regarding this claim, including those holding that an inverse condemnation claim is viable for damage to personal property and for damages which result from flooding on two occasions, as in this case. *See* Memorandum Opinions of March 4, 1991, 1991 WL 32775 (denying DuPage's motion for judgment on the pleadings as to plaintiffs' claim of inverse condemnation) and March 21, 1991 762 F.Supp. 784, 786–88 (denying DuPage's motion for a directed verdict).

## B. *Reduction for Warner's Contributory Negligence*

On the eve of trial, the parties stipulated to the amount of damages which plaintiffs had incurred, based upon the Court's prior rulings as to the correct measure of damages. The amount agreed upon was $4,160,385.00.[5] Plaintiffs have prevailed on both of their claims, although the jury concluded that Warner was 70 percent contributorily negligent. Plaintiffs concede that to the extent that an award of damages is based upon their negligence claim, it must be reduced by 70 percent to reflect Warner's contributory negligence. This reduction would entitle plaintiffs to recover $1,248,115.50 on their negligence claim (subject to setoff under the Contribution Act for the prior settlements, as discussed in the following section). DuPage argues that the same reduction should apply to the inverse condemnation claim, thereby precluding plaintiffs from recovering a greater amount under that theory. Plaintiffs contest application of comparative fault principles to their inverse condemnation claim, arguing that because such a claim is not based upon tort theory, tort principles such as comparative fault should not apply.

 At the outset, the Court must dispose of DuPage's threshold argument that having prevailed upon their negligence claim, plaintiffs are barred from an alternate recovery upon their claim of inverse condemnation. DuPage suggests that because inverse condemnation arose as a means to circumvent the doctrine of sovereign immunity which typically barred tort claims against governmental entities, *see* Van Alstyne, "Inverse Condemnation: Unintended Physical Damage," 20 *Has-*

5. The manner in which this figure was calculated remains somewhat of a mystery to the Court. In ruling upon the parties' cross-motions for judgment as a matter of law as to the correct measure of damages, the Court held that plaintiffs were entitled to recover damages reflecting the sales price of the goods destroyed in the flooding, rather than the replacement cost. (*See* Memorandum Opinion and Order of February 19, 1991 at 2–14.) This ruling was based in part upon the premise that Warner was the manufacturer of the goods destroyed, and upon the notion that an award of damages based upon the cost of replacing the goods (*i.e.* remanufacturing them) would not compensate Warner for the profit margin attributable to the manufacturing process and reflected in the sales price. (*See id.* at 10–14.) However, there had been some hint in the briefing that neither of the two Warner entities which are plaintiffs in this case had actually manufactured the goods in issue. The Court raised this issue with counsel at a status hearing held on February 22, 1991, and again during hearings conducted on February 25 and 27, 1991. At that time, the Court was informed that a separate entity, Warner Manufacturing, a wholly-owned subsidiary of plaintiff Warner Communications, had manufactured the goods and transferred them to plaintiff WEA. The Court learned further that when the goods were transferred from Warner Manufacturing to WEA, WEA was in effect "charged" for these goods, an expense recorded on its records as a "landed cost." This cost was represented to the Court to be an amount 14 percent less than the price at which WEA would subsequently sell the goods to retailers. This information having been ascertained, the Court asked for further briefing on the question of which sales price should be used in calculating damages, that of WEA or Warner Manufacturing. After consideration of these briefs, the Court concluded that damages should be calculated based upon the price or cost charged by Warner Manufacturing (the true manufacturer of the goods) to WEA, plus any separate costs which WEA subsequently incurred in packaging, storing, and distributing these goods. (*See* Minute Order dated March 4, 1991.)

In the final pretrial order, plaintiffs had calculated the net value of the goods destroyed in the July 22, 1982 flood at $530,104.06 and the net value of those destroyed in the August 7, 1982 flood at $7,375,168.22, for a total of $7,905,272.28. These figures were calculated based upon WEA's selling price. Presumably, if the landed cost charged to WEA for these goods were 14 percent less than the price at which WEA sold them, then pursuant to the Court's ruling of March 4, 1991, Warner's demand for damages in the amount of $7,905.272.28 would only have been reduced by 14 percent, to $6,798,534.28. Added to this figure would have been any costs WEA incurred in packaging, storing, and distributing the goods. Moreover, plaintiffs sought additional damages of $214,-821.39 as compensation for cleanup costs, replacement of supplies, and the like. Obviously, the stipulated amount of damages, $4,160,-385.00, is far less than what this total figure would have been. Exactly what accounted for the further reduction of more than $2.5 million is unclear. The Court had assumed that the parties had deducted from the damages claimed the $2.2 million which plaintiffs had recovered in settlement with the other defendants. However, that assumption turned out to be incorrect, as is evident from DuPage's pending request to reduce plaintiffs' recovery based upon the prior settlements.

tings L.J. 431, 440–41 & n. 51 (1969); *Granone v. County of Los Angeles, supra,* 42 Cal.Rptr. at 45, it should be unavailable in cases where this immunity does not apply.[6] This contention is incorrect. A similar argument was rejected in *Lanning v. State Highway Commission,* 15 Or.App. 310, 515 P.2d 1355 (1973). There the plaintiffs alleged that the defendant's failure to keep the base of a bridge clear from debris had caused water to back up onto their land, and asserted alternate claims of negligence and inverse condemnation against the defendant. The defendant raised an argument which is the mirror image of the argument DuPage makes here: it contended that because plaintiffs had a remedy in inverse condemnation, they had no remedy in tort. The court disagreed:

> While inverse condemnation may have developed as a remedy because of the existence of sovereign immunity, the removal of sovereign immunity means, under appropriate circumstances, that alternative remedies now exist for a plaintiff whose property may have been damaged by the tortious act of a public body. The fact that plaintiffs may have an alternative remedy is no grounds for finding the remedy he [sic] has chosen should not lie.

515 P.2d at 1359. *Accord Ingram v. City of Redondo Beach,* 45 Cal.App.3d 628, 119 Cal.Rptr. 688, 690 (1975) ("[P]rivate property owners who have suffered damages as a consequence of a public work may rely for relief on [the eminent domain provision] of the California constitution. The owner of property is not restricted to a tort recovery based on negligence.") (citations omitted). Thus, inverse condemnation remains available to plaintiffs as a distinct cause of action despite their ability to recover under a negligence theory. *See generally Aetna Life & Cas. Co. v. City of Los Angeles,* 170 Cal.App.3d 865, 216 Cal.Rptr. 831, 835 (1985) (noting differences between claims of negligence and inverse condemnation).

■ Nevertheless, although inverse condemnation represents a distinct cause of action, its overlap with tort principles cannot be ignored. As the court noted in *Aetna Life & Cas. Co.,* inverse condemnation "has its roots in the principles of tort and property law." 216 Cal.Rptr. at 835. *See also Granone,* 42 Cal.Rptr. at 44–45 ("[t]he taking or damaging of private property without compensation first being paid is in the field of tortious action"); Van Alstyne at 440–41. Thus, to the extent that tort principles have been incorporated into inverse condemnation theory, there is no apparent reason to think that the tort-based doctrine of comparative fault should not be applied to an inverse condemnation claim.

Two California decisions have indicated that a plaintiff's negligence should not be a complete bar to recovery on a claim of inverse condemnation; however, these cases did not address whether such negligence might be considered in determining the *extent* of the plaintiff's recovery. In *Blau v. City of Los Angeles,* 32 Cal.App.3d 77, 107 Cal.Rptr. 727, 733 (1973), the court concluded that the trial court had committed reversible error in instructing the jury that if it found that a substantial cause of the landslide which had damaged plaintiffs' property was the conduct of the plaintiffs or their predecessors in interest, it could not award damages against the defendant city. The court reasoned that as long as the city's conduct was *a* substantial cause of the landslide, it could be held liable despite the presence of other substantial causes. 107 Cal.Rptr. at 733.[7] Citing

---

6. As the Court observed earlier in this litigation, because DuPage had liability insurance in effect at the time of the flooding, it had waived whatever immunity was otherwise available under the Illinois Local Governmental and Governmental Employees Tort Immunity Act. *See* Memorandum Opinion and Order of March 21, 1991, 762 F.Supp. at 789–90; Memorandum Opinion and Order of June 27, 1989 at 7–8, 1989 WL 75184.

7. The appellate court in *Blau* noted that the trial court's instruction had been worded so broadly that even non-negligent conduct on the part of the plaintiffs could preclude their recovery. 32 Cal.App.3d at 84, 107 Cal.Rptr. at 732. Consequently, "the real issue [was] not one of contributory negligence but whether the jury was properly instructed on the issue of contributory or concurring causation in these inverse condemnation proceedings." As set forth above, the court concluded that the jury should have been

*Blau,* the court noted in *Ingram v. City of Redondo Beach, supra,* 119 Cal.Rptr. at 691 n. 4, that to the extent the trial court's finding for the defendant in an inverse condemnation case had rested upon the doctrine of contributory negligence or a duty upon the part of the plaintiffs to take affirmative action in order to avoid injury, it may have been erroneous. These cases make it clear that a governmental agency cannot escape liability in inverse condemnation merely because there may have been other substantial causes of the injury to the plaintiff's property in addition to the public improvement. However, they do not address the precise question presented here—whether the damages for which the government is held liable may be reduced to the extent the plaintiff or a third party has contributed to the injury. *See Doyle v. Rhodes,* 101 Ill.2d 1, 77 Ill.Dec. 759, 766–67, 461 N.E.2d 382, 389–90 (1984) (drawing distinctions between doctrines such as contributory negligence and indemnity, which shift entire loss from defendant to another party, and those such as comparative negligence and contribution, which shift only part of the loss based upon the relative culpability of the parties).

■ Although the Court has found no reported case which expressly considers this issue, *County of San Mateo v. Berney,* 199 Cal.App.3d 1489, 245 Cal.Rptr. 738, 741–42 (1988), suggests that a governmental agency should not be held entirely liable for a plaintiff's injury when other parties contributed to the damage. In *Berney,* the court held that a county sued on a theory of inverse condemnation could prop-erly cross claim against a third party for equitable indemnity. The county had allegedly planned and caused to be constructed a sidewalk adjacent to the plaintiffs' property which destroyed the lateral support to the property and caused it to subside and slide away. The county's proposed cross claim was against the real estate developer which had actually built the sidewalk as part of the subdivision which included plaintiff's home, and the claim alleged that the developer had knowingly used improper fill material and had concealed this fact from the County when seeking approval of its proposed subdivision map. The court held that under these circumstances, a cross claim for indemnity was proper. 245 Cal.Rptr. at 741. "While it is true that a public entity is liable in inverse condemnation for 'any actual physical injury to real property proximately caused by [a public] improvement *as deliberately designed and constructed,*' where, as is here alleged, a third party's fraudulent concealment caused or contributed to the injury, the third party should indemnify the public entity to the extent such conduct has contributed to a damage award against the public entity." *Id.* at 741–74 (citation omitted) (emphasis in original). *Berney* thus indicates that it is consistent with inverse condemnation theory to permit a governmental agency held liable for inverse condemnation to shift its responsibility for the damages to the party which is actually responsible for the plaintiff's injury.[8] Comparative negligence would function similarly, reducing the plaintiff's recovery in inverse condemnation when the plaintiff itself is partly responsible for its damages. In-

instructed consistent with the principle that the municipality could be held liable for inverse condemnation if its conduct was a substantial cause of damage to the plaintiffs' property, even if there were other concurring causes as well. *See also Marin v. City of San Rafael, supra* n. 2, 168 Cal.Rptr. at 752 (if public improvement proximately causes damage to plaintiff's property, "it is of no moment whether there was another concurring cause").

**8.** Where a public entity charged with inverse condemnation did not actually construct the public improvement which resulted in damage to the plaintiffs' property, it nonetheless may be held liable upon a claim of inverse condemna-tion, so long as it has approved or accepted the improvement. *Marin v. City of San Rafael, supra* n. 2, 168 Cal.Rptr. at 752–53. Perhaps *Berney* could be read narrowly to hold simply that a governmental agency sued for inverse condemnation in this circumstance can seek indemnity from another party when the fraudulent conduct of that party effectively vitiates the agency's approval or acceptance of the public improvement. However, the express rationale of the court does not so limit its holding; to the contrary, its language embracing indemnity against third parties whose conduct has "contributed to a damage award" against the governmental agency suggests a broader application.

deed, comparative negligence would operate on a more equitable basis, for in contrast to indemnity, it would not completely exonerate the public entity from liability, but merely apportion responsibility for damages according to the degree of culpability borne by each party. *See Doyle,* 77 Ill.Dec. at 767, 461 N.E.2d at 390.

There are further hints in the case law that the plaintiff itself may be held to account for conduct which contributed to its injury. Thus, in *Marin v. City of San Rafael,* 111 Cal.App.3d 591, 168 Cal.Rptr. 750, 752 (1980), although the court held that as long as a public improvement constituted a proximate cause of the damage to the plaintiffs' property, it was "of no moment" whether other parties or factors had contributed to the damage, the court also observed that in the case before it, "no contention is made, nor could any reasonably be made, that plaintiffs' damages were proximately caused by their own act, fault, or negligence." Moreover, in *Albers v. County of Los Angeles,* 62 Cal.2d 250, 42 Cal.Rptr. 89, 101, 398 P.2d 129, 141 (1965), the California Supreme Court, in holding that inverse condemnation plaintiffs could recover for the expenses they had incurred in attempting to minimize or prevent the damage to their property, relied in part upon "the general rule ... that an owner whose property is taken or damaged by a public entity is under a duty to take all reasonable steps available to minimize his loss."

> With apparently the sole exception of Iowa, *(Wilson v. Fleming* (1948), 239 Iowa 718, 31 N.W.2d 393, 398–399) the cases are uniform in upholding this requirement. *(See, e.g., United States v. First Nat. Bank* (D.C.M.D.Ala.1918) 250 F. 299, 302; *State v. Pahl* (1959), 254 Minn. 349, 95 N.W.2d 85, 91; *Town of Cape Charles v. Ballard Bros. Fish Co.* (1959), 200 Va. 667, 107 S.E.2d 436, 440;

> *City & County of Denver v. Noble* (1951), 124 Colo. 392, 237 P.2d 637, 639; *American Woolen Co. v. State* (1925), 125 Misc. 186, 211 N.Y.S. 149, 169).

42 Cal.Rptr. at 101, 398 P.2d at 141. *See Kelly v. Chicago Park Dist.,* 409 Ill. 91, 98 N.E.2d 738, 742 (1951) (duty of property owner to minimize losses " 'finds its application in virtually every type of case in which the recovery of a money judgment or award is authorized' "). *See also Arkansas State Highway Commission v. Frierson,* 269 Ark. 81, 598 S.W.2d 420, 421 (1980) (condemnee has duty to mitigate damages to the extent he reasonably can); *Department of Transportation v. Sequoyah Land Inv. Co.,* 169 Ga.App. 20, 311 S.E.2d 488, 490 (1983) (condemnee has duty to take reasonable steps to minimize damages); *Brown Bros. Equipment Co. v. State,* 51 Mich.App. 448, 215 N.W.2d 591, 593 (1974) (despite state's breach of agreement to settle or lessen consequential damages to plaintiff's business resulting from condemnation of underlying land, plaintiff was not entitled to recover relocation costs where it had been aware of breach and nonetheless did not attempt to minimize its damages). *Cf. United States v. Dickinson,* 331 U.S. 745, 751, 67 S.Ct. 1382, 1386, 91 L.Ed. 1789 (1947) (where landowners sought damages for erosion to their land which resulted when government raised height of river channel and lands which formed new river bank eroded, the Court held that "[i]f the resulting erosion ... was in fact preventable by prudent measures, the cost of that prevention is a proper basis for determining the damage"). These cases belie the contention that a plaintiff's own negligence has no bearing upon its claim for inverse condemnation and lend support to DuPage's contention that when the plaintiff has contributed to its own injury, the extent of its recovery from a governmental agency may be reduced commensurately.[9]

9. Plaintiffs have cited *Tri–County Truss Co. v. Leonard,* 467 So.2d 370 (Fla.App.1985), for the proposition that a defense of comparative negligence might properly apply to a negligence claim but not to a separate claim of strict liability arising from the same injury. In that case, the plaintiff had been injured while installing a product manufactured by the defendant. The plaintiff sued the defendant on alternate theories of negligence and strict liability, *inter alia.* The defendant asserted a defense of comparative negligence to both counts, but the trial court directed a verdict in favor of the plaintiff on that defense as it applied to the strict liability

Finally, the Illinois supreme court's decision in *Doyle v. Rhodes, supra,* 77 Ill.Dec. 759, 461 N.E.2d 382, supports application of comparative negligence principles to relieve the defendant of strict liability for an injury to which other parties have contributed. The plaintiff in that case had been struck by an automobile in the course of his work as a highway flagman. He sued the driver of the automobile, who in turn filed a third-party complaint for contribution against the plaintiff's employer, alleging that the employer had been negligent and had violated the Illinois Road Construction Injuries Act (the "RCIA"). After concluding that the employer could be held liable to the driver pursuant to the Illinois Contribution Act (*see* Section 2(c), *infra*), the Illinois supreme court considered the extent of the employer's liability. The driver contended that if the plaintiff's employer had indeed violated the RCIA, it should bear total responsibility for the plaintiff's damages even if the driver's negligence had also contributed to the injury. Relying upon prior authorities which had emphasized the special protective nature of the RCIA and which had rejected contributory negligence as a defense to liability under that statute, the driver argued that the plaintiff's employer should not be able to escape responsibility by attempting to shift the burden for damages to other parties who were also negligent. The supreme court disagreed. Although it reaffirmed that contributory negligence was not a defense to liability under the RCIA, it stressed that doctrines such as comparative negligence and contribution were different in that they did not operate in an all or nothing fashion but rather with the goal of equitably distributing responsibility for compensating the plaintiff among all parties who bear partial responsibility for the plaintiff's damages:

In Illinois, as under the common law, contribution is based on "equitable principles [which] require that ultimate liability for plaintiff's injuries be apportioned on the basis of the relative degree to which" the conduct of the various defendants "proximately caused" the injuries (*Skinner v. Reed–Prentice Division Package Machinery Co.* (1977), 70 Ill.2d 1, 14, 15 Ill.Dec. 829, 374 N.E.2d 437, *cert. denied* (1978), 436 U.S. 946, 98 S.Ct. 2849, 56 L.Ed.2d 787)....

... We believe that *Skinner* points to the direction in which the law should move in Illinois regarding contribution. An action for contribution shifts only part of the loss depending on the comparative responsibility of the parties and can be harmonized with the purpose of a safety statute, which is typically to fix liability on those who create a situation in which inattentiveness by others may result in injury.

77 Ill.Dec. at 766–67, 461 N.E.2d at 389–90. *Doyle* therefore invites the application of doctrines such as comparative negligence in order to reduce and reapportion the burden of compensation imposed upon a given defendant pursuant to a theory of liability which is otherwise strict or absolute.

■ In this case, substantial evidence was presented at trial which supports the

---

claim. The jury returned a verdict in favor of the plaintiff on both claims, but also found the plaintiff 10 percent comparatively negligent. The appellate court affirmed the trial court's decision to direct a verdict on the comparative negligence defense insofar as it was asserted with respect to the strict liability claim. *Id.* at 371. However, it did not uphold the directed verdict because it believed comparative negligence had no application to the claim of strict liability as a matter of legal theory; indeed, the court acknowledged that "lack of ordinary care which proximately contributes to a plaintiff's injuries by intentionally assuming the risks of a known danger or misusing the product are all proper defenses to strict liability." *Id.* The court concluded, however, that the defendant had failed to present evidence that plaintiff had assumed a known risk which would support application of comparative negligence to the strict liability claim in that case. *Id.* Here, in contrast, the evidence did indicate that Warner was on notice of the propensity of its property to flood and had failed to take reasonable steps to avoid or minimize flood damage to its inventory. Under these circumstances, to the extent that DuPage's liability upon an inverse condemnation claim might otherwise be absolute, comparative negligence should apply to reduce the extent of its liability. *See Coney v. J.L.G. Industries, Inc.,* 97 Ill.2d 104, 73 Ill.Dec. 337, 343, 454 N.E.2d 197, 203 (1983) (comparative negligence is a defense to strict liability actions).

jury's finding of comparative negligence. There was testimony that on occasions prior to the 1982 floods, water from the drainage ditch had flooded the parking lot and loading dock adjacent to the Warner building. Furthermore, although the flood on July 22, 1982 was the first occasion on which water had entered the Warner building and damaged Warner's merchandise, that flood resulted in only $530,104.06 in inventory damage, by Warner's estimation. (*See* n. 5, *supra.*) Although the testimony established that Warner subsequently began relocating merchandise off the floor of the warehouse in order to place it beyond the reach of flood waters, it failed to complete this reorganization by the time the second flood occurred on August 7, 1982, resulting in an estimated $7,375,168.22 worth of damage to the inventory. (*See id.*) Warner attempted to justify the delay in reorganizing its inventory upon a lack of steel beams adequate to accommodate the changes and the purported enormity of moving relocating the large number of products stored on the floor of the warehouse. However, DuPage argued, and the jury apparently agreed, that a large corporation with substantial resources reasonably could have obtained the beams and assistance needed in order to effectuate the protective reorganization in a more timely fashion. In light of this evidence, and the jury's finding that Warner was 70 percent responsible for its damages, the Court finds it appropriate to reduce plaintiffs' recovery on the inverse condemnation to 30 percent of the stipulated damages, *i.e.*, $1,248,115.50.

### C. *Setoff for Amounts Recovered Through Settlement*

Section 2(c) of the Contribution Act provides:

> When a release or covenant not to sue or not to enforce judgment is given in good faith to one or more persons liable in tort arising out of the same injury or the same wrongful death, it does not discharge any of the other tortfeasors from liability for the injury or wrongful death unless its terms so provide *but it reduces the recovery on any claim against the others to the extent of any amount stated in the release or the covenant, or in the amount of the consideration actually paid for it, whichever is greater.*

Ill.Rev.Stat. ch. 70, ¶ 302(c) (1989) (emphasis supplied). As set forth above, plaintiffs concede that the amount which they recovered in settlement from DuPage's co-defendants ($2.2 million) must be deducted from their recovery on the negligence claim, after adjustment for Warner's negligence ($1,248,115.50). This deduction reduces DuPage's liability to zero on the negligence claim. DuPage contends that the setoff provisions of the Contribution Act apply to plaintiffs' inverse condemnation claim as well. Plaintiffs disagree, contending that the provisions of the Act do not apply to an inverse condemnation claim because such a claim does not sound in tort.

Several threshold principles are not in dispute. First, that setoff pursuant to Section 2(c) will relieve DuPage of all monetary liability and leave plaintiffs solely with the settlements they obtained from DuPage's co-defendants is immaterial. As DuPage contends, *Nguyen v. Tilwalli*, 144 Ill.App.3d 968, 99 Ill.Dec. 183, 186, 495 N.E.2d 630, 633 (2d Dist.1986), leaves no room for consideration of the equities of this scenario:

> Plaintiff also argues that the result of the setoff is inequitable since the settling codefendants then bear the full burden for his injury while defendant, the only party determined to be at fault, pays nothing. Plaintiff contends this result is tantamount to a contribution to that defendant from the settling codefendants, contrary to Section 2(d) of the Contribution Among Joint Tortfeasors Act (Ill. Rev.Stat.1985, ch. 70, par 302(d)), which states, "[t]he tortfeasor who settles with a claimant pursuant to paragraph (c) is discharged from all liability for any contribution to any other tortfeasor." However, section 2(c) of the Act specifically provides for and allows setoffs such as occurred here. Moreover, the theory of recovery in a negligence action is focused upon compensation to the plaintiff for his

injuries, not punishment to the defendant (*Peterson v. Lou Bachrodt Chevrolet Co.* (1979), 76 Ill.2d 353, 363, 29 Ill.Dec. 444, 392 N.E.2d 1; *Webb v. Toncray* (1981), 102 Ill.App.3d 78, 80, 57 Ill.Dec. 757, 429 N.E.2d 874), and a plaintiff who has recovered for his damages has no basis to complain because a defendant benefitted from the setoff.

Second, it is also clear, as DuPage contends, that when a plaintiff has suffered a single, indivisible injury, it is of no import for purposes of the Contribution Act whether the various parties from which the plaintiff seeks recovery may be deemed joint or concurrent tortfeasors, *id.* 99 Ill. Dec. at 185, 495 N.E.2d at 632; *Doyle,* 77 Ill.Dec. at 764, 461 N.E.2d at 387, nor must the purported liability of these parties to the plaintiff be predicated upon a common theory of recovery, *Doellman v. Warner & Swasey Co.,* 147 Ill.App.3d 842, 101 Ill.Dec. 366, 371, 498 N.E.2d 690, 695 (1st Dist. 1986).[10] Nonetheless, plaintiffs contend that to the extent the liability of a non-settling defendant is based upon a theory of recovery other than tort, it is not subject to the provisions of Section 2(c), which on its face applies only to parties "liable in tort." In short, because inverse condemnation is not a tort, plaintiffs argue, their recovery upon this claim is not subject to setoff.

The Illinois supreme court's decision in *Hopkins v. Powers,* 113 Ill.2d 206, 100 Ill. Dec. 579, 497 N.E.2d 757 (1986), a case which neither party has cited, might be construed to lend superficial support to plaintiffs' position. In that case, the plaintiff had undertaken to drive while intoxicated and became involved in an accident. After he settled with the various individuals who had suffered damages, he sued the tavern where he had been drinking prior to the accident for contribution under Section 2(a) of the Contribution Act. In relevant part, section 2(a) provides:

> [W]here 2 or more persons are subject to *liability in tort* arising out of the same injury to person or property, ... there is a right of contribution among them, even though judgment has not been entered against any or all of them.

Ill.Rev.Stat., ch. 70, ¶ 302(a) (1989) (emphasis supplied). The plaintiff contended that because the tavern was potentially liable under the Illinois Dramshop Act, Ill.Rev. Stat., ch. 43, ¶ 135, for the injuries arising from the accident, he could assert a claim of contribution against the tavern under Section 2(a). The Supreme Court rejected the plaintiff's theory, reasoning that the tavern's sole basis for liability lay not in tort but in the provisions of the Dramshop Act:

> [I]nsofar as the serving of intoxicating beverages imposes liability on the purveyor, that liability is not grounded in tort but in the Dramshop Act. *Wimmer [v. Koenigseder,* 108 Ill.2d 435, 92 Ill. Dec. 233, 484 N.E.2d 1088 (1985)] reaffirmed the long-standing rule in Illinois that the purveyor of intoxicating beverages may be held liable only under the provisions of the Dramshop Act and that the liability so imposed is *sui generis* and exclusive. [citations omitted]
>
> Applying this consistent line of authority to the instant case, it is clear that, under Illinois law, the defendant is not "liable in tort" for purposes of the Contribution Act. Defendant's liability is limited to the exclusive, *sui generis* non-tort liability of the Dramshop Act. Because defendant is not "liable in tort," plaintiff, as a matter of law, cannot maintain an action for contribution under the Contribution Act.

100 Ill.Dec. at 581, 497 N.E.2d at 759. *Hopkins* thus stands for the proposition that when a party's liability to the plaintiff could seek contribution from the dram shops which had served him liquor, even though the dram shop could only be held liable under a nontort theory of recovery. However, *Morgan* was overruled by the Illinois supreme court in *Hopkins v. Powers,* 113 Ill.2d 206, 100 Ill.Dec. 579, 497 N.E.2d 757 (1986).

---

**10.** DuPage cites *Morgan v. Kirk Brothers, Inc.,* 111 Ill.App.3d 914, 67 Ill.Dec. 268, 444 N.E.2d 504 (2d Dist.1983), for the proposition that the setoff provisions of the Contribution Act apply to a single, fixed injury regardless of the theory under which damages are sought. *Morgan* did hold that an intoxicated motorist sued for damages resulting from an automobile accident

is based *exclusively* upon a nontort theory of recovery, that party is not one "liable in tort" and consequently is not subject to the provisions of the Contribution Act. *See Jodelis v. Harris,* 118 Ill.2d 482, 115 Ill. Dec. 369, 372, 517 N.E.2d 1055, 1058 (1987).

In this case, however, DuPage's liability to plaintiffs was not based solely upon a nontort theory; and although inexplicably neither plaintiffs nor DuPage have cited them to the Court, at least three Illinois decisions have expressly held in comparable circumstances that the Contribution Act *does* apply.

In *Doyle v. Rhodes, supra,* 101 Ill.2d 1, 77 Ill.Dec. 759, 461 N.E.2d 382 (1984), the Illinois supreme court concluded that an employer which enjoyed immunity from tort liability to its injured employee under the Workers' Compensation Act could nonetheless be considered a party "subject to liability in tort" for purposes of the Contribution Act. As set forth above, the injured plaintiff in *Doyle* had sued the driver whose car had struck him, and the driver filed a third-party complaint for contribution against the plaintiff's employer, alleging negligence and violation of the state safety statute. The court concluded that the claim was cognizable, rejecting the contention that the Contribution Act's requirement of liability in tort "precludes the existence of a right of contribution where one the of the defendants is liable to the plaintiff on a no-fault basis and enjoys a special immunity from tort liability." 77 Ill.Dec. at 763, 461 N.E.2d at 386. The court reasoned that although the defense of tort immunity was available to the employer, "[t]he potential for tort liability exists until the defense is established." 77 Ill.Dec. at 764, 461 N.E.2d at 387. Furthermore:

> As this court has recently decided in interpreting the phrase of the Contribution Act at issue here, " 'liability' is determined at the time of the injury out of which the right to contribution arises, and not at the time the action for contribution is brought." (*Stephens v. McBride* (1983), 97 Ill.2d 515, 520, 74 Ill.Dec. 24, 455 N.E.2d 54; *see also Markey v. Skog* (1974), 129 N.J.Super. 192, 204, 322 A.2d 513, 519–20). At the time

of an injury for which an employer's negligence is partly responsible, the employer is in fact "subject to liability in tort" to his employee, although that liability can be defeated depending on the response he chooses to make to his employee's claim in the event the employee decides to sue in tort.

77 Ill.Dec. at 764, 461 N.E.2d at 387. Thus, the court concluded that "the Contribution Act focuses, as it was intended to do, on the culpability of the parties rather than on the precise legal means by which the plaintiff is ultimately able to make each defendant compensate him for his loss." 77 Ill.Dec. at 765, 461 N.E.2d at 388.

The Illinois appellate court followed *Doyle* in *Cirilo's, Inc. v. Gleeson, Sklar & Sawyers,* 154 Ill.App.3d 494, 107 Ill.Dec. 417, 507 N.E.2d 81 (1st Dist.1987). In *Cirilo's,* an employee had managed to embezzle nearly half a million dollars over a five-year period from the plaintiff by periodically making out company checks to herself and cashing them at the plaintiff's bank. The plaintiff sued the accounting firm for negligence. The accounting firm in turn filed a third-party complaint for contribution against the bank, alleging that the bank had failed to exercise ordinary care in paying the forged checks. The trial court dismissed the third-party complaint, concluding that the bank was not a party "subject to liability in tort" within the meaning of the Contribution Act because the relationship between a bank and its customer is governed by contract, not tort law. The appellate court reversed. Noting that under an Illinois statute, the bank was obligated to cash only those checks which were "properly payable," the court reasoned that the bank could be deemed to have committed a breach of this duty which, along with the accounting firm's negligence, had caused a single injury to the plaintiff. Thus, "[u]nder the rationale of *Doyle,* [the bank] and [the accounting firm] are clearly 'subject to liability in tort arising out of the same injury,' even though their duties to [plaintiff] arose from their contracts with that party, not from

tort law." 107 Ill.Dec. at 419, 507 N.E.2d at 83.

Finally, in *Joe & Dan International Corp. v. U.S. Fidelity & Guaranty Co.*, 178 Ill.App.3d 741, 127 Ill.Dec. 830, 533 N.E.2d 912 (1st Dist.1988), the court reiterated that parties sued under nontort theories may be subject to the provisions of the Contribution Act so long as they were *potentially* liable to the plaintiff in tort at the time of plaintiff's injury.

"[L]iability in tort," governing the right of contribution among tortfeasors (Ill.Rev.Stat.1985, ch. 70, par. 302), has been construed to mean "potential" tort liability. As such, it is determined at the time of the injury to the plaintiff seeking to hold liable under some theory, not necessarily a tort theory, less than all parties who were potentially liable therefore. (*Doyle v. Rhodes* (1984), 101 Ill.2d 1, 10–11, 77 Ill.Dec. 759, 461 N.E.2d 382.)

127 Ill.Dec. at 836, 533 N.E.2d at 918.[11] *Cf. Giordano v. Morgan*, 197 Ill.App.3d 543, 143 Ill.Dec. 875, 879, 554 N.E.2d 810, 814 (2d Dist.1990) (amounts paid in settlement by party sued on alternate theories, not all of which were tort theories, are subject to setoff under Section 2(c)).

In accordance with this line of authority, the Court must reject plaintiffs' contention that Section 2(c) of the Contribution Act does not apply to their inverse condemnation claim. Not only was DuPage potentially liable to Warner in tort at the time of the flooding[12], but the jury ultimately found DuPage liable for negligence. Consequently, DuPage qualifies as a party "liable in tort" which may invoke the setoff

provisions of Section 2(c), even though the basis for its liability upon the inverse condemnation claim is not tort but the provisions of the Illinois constitution. As *Doyle* and its progeny make clear, even if DuPage had been sued solely upon a claim of inverse condemnation, its potential liability in tort at the time of the events giving rise to this suit would suffice to bring the provisions of the Contribution Act into play irrespective of the theory upon which DuPage was ultimately held liable.[13] Accordingly, the Court finds that a setoff of the $2.2 million in prior settlements is required as to plaintiffs' recovery on the inverse condemnation claim, again reducing DuPage's monetary liability to zero.[14]

## III. CONCLUSION

For the reasons set forth above, the Court finds that the County of DuPage is liable to plaintiffs on the claim of inverse condemnation. However, the Court concludes that the doctrine of comparative negligence applies to the inverse condemnation claim, calling for a 70 percent reduction of plaintiffs' stipulated damages to $1,248,115.50. The Court further concludes that a setoff of the $2,200,000 which plaintiffs received through settlements with DuPage's co-defendants must be made against plaintiffs' recovery on the inverse condemnation claim, rendering plaintiffs' ultimate recovery zero on that claim as with the negligence claim. Pursuant to the jury's verdict and this Memorandum Opinion and Order, the Clerk shall enter final judgment in the amount of $0.00

11. *Doellman, supra,* 101 Ill.Dec. at 370–71, 498 N.E.2d at 694–95, similarly emphasizes that it is the party's prospective liability in tort at the time of the events triggering the suit which matters for purposes of the "liability in tort" language of the Contribution Act.

12. *See* n. 6, *supra.*

13. In order for the setoff to apply, the defendants which settled must also have been subject to liability in tort. *See Giordano,* 143 Ill.Dec. at 879, 554 N.E.2d at 814; *McCombs v. Dexter,* 186 Ill.App.3d 484, 134 Ill.Dec. 738, 739, 542 N.E.2d 1245, 1246 (3d Dist.1989). There is no dispute in this case that each of the defendants who

settled with plaintiffs prior to trial were subject to liability in tort for purposes of the Contribution Act.

14. In *Wieboldt Stores, Inc. v. Schottenstein,* 111 B.R. 162, 170 (N.D.Ill.1990), Judge Holderman distinguished *Doyle* and its progeny and held that when a party is neither actually nor potentially subject to liability in tort, it is not subject to the provisions of the Contribution Act even if it shares culpability for the plaintiff's injury. As set forth above, the instant case presents a different situation, in light of DuPage's actual liability in tort to plaintiffs. Thus, the rule applied in *Doyle, Cirilo's,* and *Joe & Dan* governs here.

in favor of the plaintiffs on Counts I and II of their Third Amended Complaint.